**George and Carolyn HIGGINS et al.,**
**Plaintiffs,**

v.

**BOARD OF EDUCATION OF the CITY OF GRAND RAPIDS, MICHIGAN et al., Defendants.**

**No. CA 6386.**

United States District Court,
W. D. Michigan, S. D.

July 18, 1973.

---

Stuart J. Dunnings, Jr., Dunnings & Gibson, P.C., Lansing, Mich., Louis R. Lucas, Memphis, Tenn., Nathaniel Jones, New York City, for plaintiffs.

Harold S. Sawyer, Warner, Norcross & Judd, John D. Tully, Warner, Norcross & Judd, Peter Armstrong, Varnum, Riddering, Wierengo & Christenson, Eugene Alkema, Grand Rapids, Mich., Edmond R. Wolven, Rockford, Mich., James M. Catchick, Kent J. Vana, Benham R. Wrigley, Jr., James A. Engbers, Miller, Johnson, Snell & Cummiskey, Grand Rapids, Mich., Eugene Krasicky, George L. McCargar, Jr., Lansing, Mich., Grant J. Gruel, Cholette, Perkins & Buchanan, Grand Rapids, Mich., George E. Bushnell, Jr., Detroit, Mich., Roger D. Anderson, Grand Rapids, Mich., for defendants.

## OPINION AND ORDER

ENGEL, District Judge.

This is a metropolitan desegregation action brought by individual plaintiffs and the class which they represent, determined by order entered June 19, 1972, to be negro children and the parents of negro children seeking relief on behalf of themselves and on behalf of all other school children and their parents or guardians in Kent County, Michigan, who are similarly situated and affected.

Plaintiffs invoke the jurisdiction of the court under 28 U.S.C. § 1343(3), the suit being authorized by 42 U.S.C. § 1983. The civil rights claimed to have been violated are those secured plaintiffs by the Fourteenth Amendment to the Constitution and by 42 U.S.C. § 1981.

On September 9, 1971, the court ordered the joinder of those eleven outlying districts which are: Comstock Park Public Schools, East Grand Rapids Public Schools, Forest Hills Public Schools,

448

Godfrey Lee Public Schools, Godwin Heights Public Schools, Grandville Public Schools, Kenowa Hills Public Schools, Kentwood Public Schools, Northview Public Schools, Rockford Public Schools, and Wyoming Public Schools.

On October 14, 1971, the plaintiffs moved for leave to amend their complaint and filed in connection therewith an amended complaint which added Philip E. Runkel as Superintendent of the Grand Rapids Public Schools, he having since replaced defendant Norman P. Wienheimer, and added as well the State defendants Michigan State Board of Education and John W. Porter, its Superintendent; Kent Intermediate School District and individual members of the Board; William G. Milliken, Governor and Chief Executive Officer of the State of Michigan; and Frank J. Kelley, Attorney General and Chief Legal Officer of the State of Michigan. Motions to dismiss were made by nearly all of the added parties defendant and these were heard together with other motions on November 4, 1971. The court denied these motions, although it did subsequently grant a motion to strike a certain paragraph from plaintiffs' amended complaint as will appear in the files and records of the cause.

On this posture of the pleadings, the matter came on for trial upon all issues except remedy on January 10, 1973. Thus all parties who might be affected by any judgment of the court were given the opportunity to defend on the issues of constitutional violations charged against them by the plaintiffs. Trial commenced January 10 and consumed 27 actual trial days between that date and the close of all proofs on March 14, 1973.

Plaintiffs' complaint charges defendant Grand Rapids Board with maintaining and perpetuating a bi-racial segregated public school system violative of the plaintiffs' rights to due process and equal protection of the law under the Fourteenth Amendment to the Constitution of the United States. The complaint also alleges that the State defendants in various ways by action and inaction have participated in the creation and maintenance of a bi-racial segregated public school system in the Grand Rapids District and to a limited extent charges the local school district defendants with involvement through action or inaction.

In addition to the overall maintenance of a bi-racial and discriminatory school system, plaintiffs allege and proofs go to a number of specific acts and conditions existing within the Grand Rapids School District which they claim are violative of their constitutional rights.

I. GEOGRAPHICAL AND HISTORICAL CONTEXT

While most of the proofs in the case go to circumstances existing within the City of Grand Rapids and its environs from the middle of this century, a proper perspective and understanding of the issues requires at least some history of more ancient vintage.

The City of Grand Rapids is the heart of an urban population and industrial and commercial center lying in the southwest portion of the State of Michigan, the largest such center in the State outside of Detroit. Incorporated as a village in 1838 and as a city in 1850, it lies generally in the southwest quadrant of Kent County.[1] It is the county seat and had a population of 197,649 in 1970. The 1970 county population was 411,044. Its historical importance is due to its location along the Grand River, Michigan's largest, which enters the city from the northeast, flows southward to bisect a good portion of the central city before flowing west towards its outlet in Lake Michigan at Grand Haven.

The Grand Rapids School District, a second class school district, is generally coterminous in its boundaries with those of the City of Grand Rapids, having been so by law until the passage of Public Act 177 of Michigan Public Acts, 1962.

1. Michigan Manual, 1971–1972, p. 374.

The Kent Intermediate School District is a creature of state law with quite limited ministerial and administrative functions. It is not coterminous with the County of Kent, although it lies mostly within the county. There are twenty constituent local school districts within the Kent Intermediate School District, including Grand Rapids and the eleven other local school districts named as added defendants in this suit. Of these eleven added school districts, ten share a common boundary with Grand Rapids. Added defendant Rockford School District does not, and is essentially rural and agricultural in characteristics, although it is readily accessible to Grand Rapids by good highways.[2]

The East Grand Rapids School District is essentially coterminous with the City of East Grand Rapids, incorporated as a village in 1891 and as a home rule city in 1926.[3] A residential community of 12,565 in 1970, East Grand Rapids is surrounded on three sides by the City of Grand Rapids. It lies about 2 miles to the south and east of the central business district and immediately adjacent to and due east of the principal areas of black residential population.

## II. POPULATION and RESIDENTIAL PATTERNS

A comparison between the growth of the black and the white population in Grand Rapids is most useful to show the changes which have taken place and when they occurred.

The following figures are for total population of all ages:[4]

| Census Year | Kent County Total | City of Grand Rapids | | Total |
| | | White % | Black % | |
| --- | --- | --- | --- | --- |
| 1870 | 50,403 | 16,407–99.4% | 100–.6% | 16,507 |
| 1880 | 62,671 | 31,584–98.6% | 429–1.3% | 32,016 |
| 1890 | 73,253 | 59,657–99% | 602–1% | 60,278 |
| 1900 | 109,922 | 86,952–99.3% | 604–.7% | 87,565 |
| 1910 | 129,714 | 111,879–99.4% | 665–.6% | 112,571 |
| 1920 | 159,145 | 136,472–99.2% | 1,090–.8% | 137,634 |
| 1930 | 183,041 | 165,555–98.2% | 2,795–1.7% | 168,592 |
| 1940 | 240,511 | 161,567–98.3% | 1,660–1% | 164,292 |
| 1950 | 288,292 | 168,775–96% | 7,075–4% | 175,980 |
| 1960 | 363,187 | 162,535–91.7% | 14,260–8% | 177,313 |
| 1970 | 411,044 | 174,025–88% | 22,296–11.3% | 197,649 |

From the overall population figures, it can be seen that the black population in the City of Grand Rapids was extremely small up to the 1940's. In 1940 1,660 blacks of all ages resided within the city, only 1% of the total population.

The rapid increase in absolute numbers and in percentage of total population is most apparent. Thus, in the twenty years between 1950 and 1970, the actual black population in Grand Rapids tripled from 7,075 to 22,296.

Where the increasing black population came to live is shown by the several maps by census tract introduced into evidence as plaintiffs' exhibits 8 (1950), 9 (1960),

---

2. A duplicate of the map of the Kent Intermediate School District, PX 85, is attached to the original of this opinion only, as Appendix A. Although there are some minor errors in it, as brought out in the testimony, it nevertheless is a useful geographic reference source.

3. Michigan Manual, 1971–1972, p. 371.

4. Kent County figures from Michigan Manual, 1971–1972, pp. 420–421. Other figures, State defendants' exhibit I. No black population figures for county available, but proofs indicate it is relatively slight.

and 7A (1970). To anyone examining the record in this case and endeavoring to obtain an accurate understanding of where actually blacks lived during these respective periods, caution must be had against drawing too many conclusions based upon the maps alone without reference to all of the testimony in the case. The reason, due to no fault of any party, is primarily mechanical.

In the first place, it was brought out that the actual areas covered by census tracts were not consistent from census to census. Thus, what might appear to be a shift in residential patterns could, on closer scrutiny, simply be a change in the boundary descriptions of the census tracts used to measure them. Likewise, the maps do not show the actual number of residents in any given census tract and hence can be misleading as to concentrations in one particular area or another. For example, a large part of that area lying along the south bank of the Grand River, downstream from the central business district, marked solidly in the 1950 census as being 50% to 79.9% black, is and always has been uninhabited altogether and used for industrial, railroad and sewer disposal facilities.

To gain a more accurate picture, the court requested and the plaintiffs prepared what became plaintiffs' exhibit 82 and in which, for 1970, the same census data was placed upon the map, but figured on a block-by-block basis. Time and the cost thereof prevented similar treatment of previous years, but the 1970 results are highly revealing and a far more accurate portrayal of actual residential patterns.

It will thus be seen on the census tract maps that there was an apparent large area of black population between 5% and 24.9% to the northeast of the general area of black concentration, whereas by the more refined block census data, that population is shown to be located generally in an area bounded by Fuller Avenue, Ball Avenue, Knapp Street and Michigan Street, and to be largely contiguous with other black residential neighborhoods.

Again, the concentration earlier mentioned and lying along the south bank of the Grand River is more accurately shown as being concentrated mostly to the east and adjacent to the central black residential district while correspondingly large uninhabited areas are excluded. Also, the block census map for 1970 (PX 82) shows the existence of at least some spreading out of the black population from the central areas into the outlying suburbs which could not be and is not shown by the less refined PX 7A.

There was testimony also on the subject. The concentration in the northeast apparent in 1970 is shown to be primarily due to a private housing project, Auburn Heights Subdivision, but even this observation must be tempered with the knowledge that certain of the areas so marked are, in fact, largely uninhabited because of use for public purposes. Similarly, there is shown in Kelloggsville to the south 1970 concentrations of 5% to 24.9% and 25% to 49.9% black population which would appear to have sprung up in the meantime. Actual numbers are not a part of this record, but the proofs indicate that this community is a stable one of long standing.

It should be further noted that the maps upon which the various census figures were imposed were recent, and the superhighways and expressways shown on the several maps were not, in fact, present in 1950, adding another consideration, that of the removal from residential use of large areas for highway purposes over the periods of time involved.

The court concludes that the growth of the actual residential patterns of the black community in Grand Rapids commenced from concentrations within what is called the inner-city and in an area along the south of Fulton Street, the area closest to the central business district and south and along the railroad tracks and that line which is now marked by Highway U. S. 131 with access to the superhighway. Growth proceeded generally to the south of Fulton Street and eastward to East Grand Rapids until it will

be seen that in 1970, there were very high concentrations of black population almost to the exclusion of white, between Wealthy Street to the north, Godfrey Avenue to the west, Stevens, Garden, Oakdale and Hall Streets to the south and within about two blocks of the East Grand Rapids boundary line to the east.

■ The court finds that by far the vast majority of the black population of all ages within the City of Grand Rapids resides within this area, and that there is consequently substantial de facto residential segregation in the City of Grand Rapids.

An understanding of the residential patterns within the City of Grand Rapids requires as well a consideration of the patterns of other ethnic and racial groups besides the black. There is a growing population of Spanish-American citizens in the City of Grand Rapids and the area of greatest concentration is south of Hall Street, just west of the Expressway, that area served by Hall Elementary School and Roosevelt Park Primary School. Another concentration of Spanish-American population finds itself near the Stocking School, on the west side. As to other distinct nationality groups, the most populous is the Dutch. As the court understands it, the Dutch families originally settled in those areas which are now predominantly black and tended thereafter to concentrate in the southwest, in the Mulich Park region, in the Shawnee area to the south of 28th Street. Those of Polish extraction have precipitated to the west side of the city,

on the other side of the Grand River and there tend to be concentrations of Polish families on the lower west side in particular. The Italian community has almost altogether dispersed today, but originally resided in the area around Hall Street and Sheldon School, further tending to surround Our Lady of Sorrows Church on Hall Street and Jefferson. Of all the sections of the city, the most diverse in population and makeup is in the northeast area which was characterized as the "melting pot" of Grand Rapids.

### A. Origins of Residential Segregation

Two witnesses were especially helpful in explaining the causes of residential segregation. Milton J. Miller, presently Director of Educational Facilities Planning for the Grand Rapids Board and with the system since 1950, clearly had the most intimate knowledge of school attendance areas, history, residential patterns and movements, almost block-by-block throughout the city and was usually graced with as much objectivity as any witness who testified. Of great assistance to the court, also, was the testimony of Karl Taeuber, Professor of Sociology from the University of Wisconsin who testified for the plaintiffs as an expert in urban residential patterns, particularly with respect to the segregated patterns of blacks and the reasons for them.[5]

Dr. Taeuber testified that there were large migrations of blacks from the southern states to the northern states and cities in World War I and World

---

5. Of interest, Dr. Taeuber is quoted by Mr. Justice Powell in a footnote to his recent opinion, concurring and dissenting in part, in Keyes v. School District No. 1, 413 U.S. 189, 223, 93 S.Ct. 2686, 2704, 37 L.Ed.2d 548, 1973.
"As Dr. Karl Taeuber states in his article, Residential Segregation, 213 Scientific American 12, 14 (Aug. 1965):
'No elaborate analysis is necessary to conclude from these figures that a high degree of residential segregation based on race is a universal characteristic of American cities. This segregation is found in the cities of the North and West as well as of

the South; in large cities as well as small; in nonindustrial cities as well as industrial; in cities with hundreds of thousands of Negro residents as well as those with only a few thousand, and in cities that are progressive in their employment practices and civil rights policies as well as those that are not.'
"In his book, Negroes in Cities (1965), Dr. Taeuber stated that residential segregation exists 'regardless of the character of local laws and policies, and regardless of the extent of other forms of segregation or discrimination.' Id., at 36."

War II and that these blacks generally moved in upon pre-existing white residential patterns there, displacing the former white residents. He testified that the typical expansion was at the periphery area, but that there was some channeling caused by natural boundaries and other barriers. The degree of concentration has been more pronounced in the north than in the south.

Dr. Taeuber created what he called a "segregation index", a measurement under which an index figure of "0" equals a completely integrated mixture of population, whereas an index of "100" indicates a completely segregated circumstance. Dr. Taeuber had applied his system to approximately 200 cities in the United States which had more than 50,000 population including more than one thousand non-white households in them. He reported trend data also in 108 cities for 1940, 1950 and 1960. The cities studied had an earlier general average segregation index of 60, although some were in the 70's, 80's and 90's. He testified that in comparing regions, there has been a shifting pattern and that there was a different pattern of urban growth between the north and the south. The shifting pattern was more apparent in the south where earlier there had been a wider dispersal of the black population. He testified that in the typical southern cities mass transportation had wiped out scattered pockets of population and that thereafter were conforming very much to the patterns of cities elsewhere in the country.

Dr. Taeuber stated that there were, in the scholarly tradition, three main reasons for segregated housing patterns (a) economic, (b) choice and (c) discrimination. It was his conclusion that many whites wished to live in a segregated pattern, but that poll data showed that if blacks preferred to live in segregated patterns, they, in fact, preferred to live with much less of it than they presently have. He stated that there was some separatist movement among blacks in the last decade, but that nevertheless the general preference toward integration continued to prevail. In comparison with other groups having an ethnic identity, Dr. Taeuber testified that the studies using census data for this purpose show that there have in the past been degrees of segregation along other ethnic lines, but that this continues to decrease with each decennial census. Dr. Taeuber stated that while blacks typically have few resources, it is easy to overstate the impact which this fact has upon their concentrated residential patterns. Dr. Taeuber testified that the typical black migrant to a northern state was part of a highly selective group whose average educational level more closely resembled that of the areas to which he was migrating than those from which he came. He stated that there is evidence that race has a bearing on the choice of first residence. However, whereas other minority groups will tend thereafter to disperse, such has not been the history of the black in the northern city, although data tends to indicate some slight dispersal in the 1970 census figures. Dr. Taeuber stated that the typical black migrating to a northern city, either directly from the South or cross migrating from some other area, was young and that thus the more typical age spread of population was not to be expected within residential areas in which he settled. Because the migrants were younger and of child-bearing age and because the birth rate is somewhat higher for black populations, the average age of the black citizen in northern cities is younger than that of the white.

Turning to Grand Rapids, Dr. Taeuber stated that according to his index, Grand Rapids had a 1960 segregation index of 90 which had reduced in the last decennial census, to 85, a decline which he felt to be relatively insignificant. The 1970 census data, he recalled, showed approximately 4,000 black families renting dwellings in Grand Rapids with a median rental of approximately $78 per month, whereas 19,000 white families rented with a median rental of $85 per month. At the same time, 3,000 blacks were owners of homes which had

a value of approximately $10,000 and 38,000 whites owned homes having an average value of $15,000. As to all houses valued under $10,000, 1100 were owned by blacks and 7,000 by whites. Dr. Taeuber stated that, compared to other cities, black homeownership in Grand Rapids is quite high.

Measuring Dr. Taeuber's expert but generalized testimony against the facts found to exist in Grand Rapids is most revealing. His testimony concerning black migration from the south generally is confirmed by the population statistics within the City of Grand Rapids over the years involved. His testimony as to natural boundaries or barriers is confirmed in Grand Rapids by the rather apparent barriers posed by the expressways and by the Grand River. His finding of a slight decrease in segregation in cities generally is borne out by census data applying to Grand Rapids. His testimony concerning the age of the migrants and higher birth rate finds much confirmation in the growth of population within the black neighborhoods in the inner-city area of Grand Rapids.

The evidence suggests some major causes of black residential concentration. Rapid inflow and growth of black population would to a great extent follow traditional tendencies of minorities and ethnic groups upon arrival in a city to group together. Economic ability of whites to acquire new and more expensive homes farther out would make older homes closer to the center of town more available. This would be particularly true where the increasing affluence of whites during the period, combined with the advent of the expressway, made suburban living both possible and attractive. Bias-generated concerns by both blacks and whites which made the whites inhospitable to black movement elsewhere in the city and correspondingly made the black himself reluctant to move into areas in which he feared a hostile reception had to play a large part. It is certainly reasonable to infer that reluctance on the part of white homeowners to sell their homes to blacks and a similar reluctance on the part of realtors to participate in any transaction which might have that result had much impact. The retained identities of other ethnic groups within the city also had to play an important part.

In short, the evidence preponderates strongly in favor of a finding that existing de facto residential segregation throughout the city is the result of factors other than any policies or practices of the Grand Rapids Board of Education or other defendants in this lawsuit.[6]

## III. THE SCHOOLS

### A. Quality of Facilities and Faculty

There is no claim made and no proof to support any claim that the physical facilities afforded the children in predominantly black schools are inferior to

6. In making this finding the court recognizes that Michigan courts for years upheld and enforced restrictive covenants in deeds and plats against use or occupancy by others than Caucasians, and such covenants were upheld as late as 1947, when Sipes v. McGhee, 316 Mich. 614, 25 N.W.2d 638 was reversed by the United States Supreme Court and the practice abolished. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed.2d 1161 (1947). Evidence also was received during the trial, over objection, from which it can be properly inferred that until 1970 abstract and title insurance companies doing business in Michigan, included in their title insurance policies restrictions based upon race, color or national origin where the real property to which the policies applied was subject to racial restrictive covenants of record. Upon action of the Department of Justice, relying upon Section 804C of the Civil Rights Act of 1968, 42 U.S.C. § 3604(c), such practice was finally discontinued. (See PX 46 and 47). Also introduced into evidence as plaintiffs' exhibits 45 and 46 and considered by the court were underwriting manuals issued in June 1935, November 1936 and February 1938 by the Federal Housing Administration. These Manuals set out the underwriting and valuation procedure under Title II of the National Housing Act and can be said to both condone and encourage restrictive covenants prohibiting the occupancy of properties except by the race for which they are intended, as a means for keeping up the rating of a particular location.

those of the system as a whole. It appears to be universally acknowledged by all who testified on the subject that Grand Rapids schools are uniformly maintained at the very high level. Those schools in the inner-city, black or white, are, as might be expected, older than those in the outlying areas, but they have been well kept and well equipped. Plans of the Grand Rapids Board have contemplated the replacement of many of the schools, but such have been largely delayed by the pendency of this action. In the meantime, the school district has proceeded with plans for the expansion of playground area, landscaping and other improvements which were in progress prior to and at the time of the trial.

With regard to the quality of the teaching itself, there was some evidence of dissatisfaction among individual plaintiffs who testified. Many complaints were somewhat typical of those made by parents of school children anywhere of any race. Some complaints appeared justified, but it was a rather interesting observation of the court that in nearly all of those instances, further examination of the witness brought out that the practice complained of was corrected.

■ On the whole, however, the evidence indicated a uniformly high quality of the teachers, both black and white, within the inner-city and without.

### B. Enrollment

Total membership in the public and non-public schools in Kent County for the last six years (1967–1972) has remained relatively stable. (See DX 9). A high point was reached in 1969 when there were 118,439 students enrolled in Kent County schools. A comparison of 1967, 1969 and 1972 is illustrative:[7]

| | 1967 | | 1969 | | 1972 | |
|---|---|---|---|---|---|---|
| Grand Rapids | 34,185 | 29.2% | 35,147 | 29.7% | 34,735 | 30% |
| 11 added defendants | 41,003 | 35.1% | 43,304 | 36.6% | 44,591 | 38.5% |
| Other public schools | 14,864 | 12.7% | 15,529 | 13.1% | 16,256 | 14.0% |
| Non-public schools | 26,876 | 23.0% | 24,459 | 20.6% | 20,271 | 17.5% |
| | 116,928 | | 118,439 | | 115,853 | |

The most pronounced difference has been in the attendance in non-public schools which has dropped from 26,876, or 23% of the total in Kent County, to 20,271 or 17.5% of the total for 1972. The Grand Rapids school system has shown a slight drop in overall attendance from a high of 35,147 in 1969 to 34,735 in 1972.

The most dramatic drop in attendance is in the non-public schools which have registered a decrease in excess of 6,600 in the last six years. Statistics furnished do not indicate where these children live. Appendix A (Appendix A is omitted from published opinion and appears only as appended to original opinion) shows, however, the location of

7. The figures herein referred to are those of the District's non-public schools in the Kent Intermediate District, except Thornapple Kellogg School. They do not include certain small areas on the fringe which are in Kent County, but within other Intermediate School Districts.

these schools. The figure is significant, in any event, as showing the high proportion of children who have traditionally attended non-public schools within the county, and has a two-fold importance in this lawsuit.

█ First, the decrease in non-public school attendance supports a conclusion that there has probably been no significant escape from the public to the non-public schools in order to avoid integration efforts of the Grand Rapids School Board, or the possible results of this lawsuit. Second, the relationship of non-public school attendance to that of Grand Rapids and the other public schools is significant in understanding the origins of overcrowding which developed within the inner-city.

With respect to the membership of the school attendance, the total public school enrollment in the Grand Rapids District and the 11 added suburban districts is given in DX 10 as 78,493. Of this number a total of 8,969 are black, of whom 8,651 attend public schools in the Grand Rapids School District. Again, overall attendance is down slightly from 1971–1972, but relatively stable. The breakdown for 1972 and 1973 follows:

## STUDENTS
## NUMBER AND PERCENT BLACK, DEFENDANT
## SCHOOL DISTRICTS

1972–73

| | | | |
|---|---|---|---|
| Grand Rapids | 8,651 | 25.5% | 33,902 |
| Comstock Park | 1 | 0.1 | 2,144 |
| East Grand Rapids | 6 | 0.2 | 3,603 |
| Forest Hills | 18 | 0.4 | 4,653 |
| Godfrey Lee | 2 | 0.1 | 1,394 |
| Godwin Heights | 13 | 0.4 | 3,275 |
| Grandville | 30 | 0.7 | 4,532 |
| Kenowa | 27 | 0.7 | 3,633 |
| Kentwood | 99 | 1.6 | 6,133 |
| Northview | 6 | 0.2 | 3,439 |
| Rockford | 18 | 0.4 | 4,210 |
| Wyoming | 98 | 1.3 | 7,575 |
| Totals | 8,969 | 11.4% | 78,493 |

Turning to the Grand Rapids School District itself, a breakdown in the public school enrollment from 1939 to date is shown on the chart on the following page.[8]

---

8. Caution must be exercised in viewing these figures and, indeed, all school attendance figures for the reason that over the years, different methods of record-taking prevailed. For example, from 1939 to 1954 enrollment was kept on a black and white basis. Blacks and other non-whites were not separated by the figures, from 1954 to 1969. From 1969, the blacks are separated from other racial or ethnic groups of whom the most predominant is Spanish-American. The figures also include variations in the size and geographical area of the Grand Rapids District itself as it experienced boundary changes. Also, figures supplied by the exhibits and updated answers to interrogatories frequently include special school enrollment and may change according to Head Start and pre-Kindergarten programs. An effort has been made to present these figures, taken from the several exhibits, in a uniform fashion, but some variation is inevitable. In the court's judgment, however, the variation does not affect the value of the figures as a whole for the purposes employed.

### GRAND RAPIDS SCHOOL DISTRICT
### PUBLIC SCHOOL ENROLLMENT 1939 to 1973
#### From PX–83

| Year | No. of Black and Non-White enrollment | Total Enrollment | % Black and Non-White |
|---|---|---|---|
| 1939–40 | 621 | 25,745 | 2.41% |
| 1940–41 | (Missing) | | |
| 1941–42 | 621 | 24,080 | 2.58% |
| 1942–43 | 587 | 22,860 | 2.57% |
| 1943–44 | 628 | 21,666 | 2.90% |
| 1944–45 | 740 | 21,070 | 3.51% |
| 1945–46 | 827 | 21,517 | 3.84% |
| 1946–47 | 914 | 21,486 | 4.25% |
| 1947–48 | 1,002 | 21,441 | 4.67% |
| 1948–49 | 1,136 | 20,989 | 5.41% |
| 1949–50 | 1,250 | 20,853 | 5.99% |
| 1950–51 | 1,350 | 20,700 | 6.52% |
| 1951–52 | 1,516 | 21,405 | 7.08% |
| 1952–53 | 1,695 | 22,373 | 7.58% |
| 1953–54 | 1,968 | 23,252 | 8.46% |
| (From Ex G GR Ans. to Interr. [excludes G.R.J.C.]) | | | |
| 1954–55 | 2,284 | 23,303 | 9.80% |
| 1955–56 | 2,658 | 24,227 | 10.97% |
| 1956–57 | 2,880 | 25,334 | 11.37% |
| 1957–58 | 3,260 | 25,826 | 12.62% |
| 1958–59 | 3,576 | 26,496 | 13.50% |
| 1959–60 | 3,833 | 26,708 | 14.35% |
| 1960–61 | 4,197 | 27,609 | 15.20% |
| 1961–62 | 4,610 | 30,891 | 14.92% |
| 1962–63 | 4,917 | 31,664 | 15.53% |
| 1963–64 | 5,256 | 32,106 | 16.37% |
| 1964–65 | 5,635 | 32,204 | 17.50% |
| 1965–66 | 6,032 | 32,724 | 18.43% |
| 1966–67 [1] | 6,579 | 33,890 | 19.41% |
| 1967–68 | 7,069 | 33,884 | 20.86% |
| 1968–69 | 7,333 | 34,528 | 21.24% |

| Year | Black | Other Racial/Ethnic Predominantly Span-Am | Total Enroll. | % of Black |
|---|---|---|---|---|
| 1969–70 * | 7,568 | 767 | 34,579 | 21.89% |
| 1970–71 ** | 7,739 | 1,061 | 34,360 | 22.52% |
| 1971–73 *** | 8,203 | 1,074 | 33,493 | 24.49% |
| 1972–73 | 8,459 | 1,155 | 32,864 | 25.74% |

Note: All of above figures (1969–1973) do not include enrollment in special schools.

1. From 1966–1973, figures include pre-kindergarten enrollment.

\* From Exhibit G to defendants' Answer to Interrogatory (PX 1)

\*\* From Updated Answers to Interrogatory 101

\*\*\* PX 86

It can be seen that while in 1940 the overall black population in Grand Rapids was only 1% of the total (see chart on page 6), the percentage of black enrollment in 1941–42 was 2.58% in the public schools. Again, in 1950, while blacks accounted for but 4% of the overall population within the city, black school children accounted for 6.52%. The rapid increase in actual numbers and percentages of black residents and also black school children is well illustrated by a comparison year to year of the exhibit above with that which is earlier given. (The earlier chart is found on page 6.)

Until the mid-sixties, the Grand Rapids School system continued to operate its schools with traditional school attendance boundaries as it had historically in the past. The elementary schools continued to be neighborhood, walk-in schools. There had been a rather steady growth in overall attendance. White enrollments were increased by annexations in the early sixties, but the black student enrollments in Grand Rapids schools showed a dramatic increase between 1950 and 1970. This was especially true at the elementary level.

| YEAR | NUMBER OF STUDENTS | | | PERCENTAGES | |
| | NON-WHITE | WHITE | TOTAL | %NON-WHITE | %WHITE |
| --- | --- | --- | --- | --- | --- |
| 1950 | 888 | 11,484 | 12,372 | 7.2 | 92.8 |
| 1955 | 1,930 | 13,727 | 15,657 | 12.3 | 87.7 |
| 1960 | 3,059 | 13,937 | 16,996 | 18.0 | 82.0 |
| 1965 | 4,007 | 15,823 | 19,830 | 20.2 | 79.8 |
| 1970 | 5,278 | 14,412 | 19,690 | 26.8 | 73.2 |
| 1972 | 5,633 | 12,409 | 18,042 | 31.2 | 68.8 |

From the foregoing figures, it can be seen that non-white enrollment in elementary schools increased 351% from 1950 to 1965 and another 31.7% from 1965 to 1970. At the same time, white enrollment increased 38% from 1950 to 1965, but decreased 9% from 1965 to 1970. By the time of trial there had been a further increase in black children enrolled in elementary schools and an additional drop of two thousand white children.

The concentrations of black elementary school attendance until 1965 was closely reflective of the imbalanced residential patterns which continued to develop. Of a total of 36 elementary schools in 1954, 28 had non-white enrollments of less than 5%, five (Colbrook, Jefferson, Madison, Sigsbee and Vandenberg) had 10–30% non-white, and three had concentrations of black students of over 40.1% (Franklin—81%, Henry—82%, and Sheldon—80%).

By 1965, 97% of all non-white elementary students in the system found themselves enrolled in eleven inner-city elementary schools amid steadily shrinking white enrollment. The eleven schools had an average non-white enrollment in 1965 of 83%.

By 1970 the average percentage of black children attending the same eleven schools had increased from 83% to 89%, although the black enrollment in the same schools was then only 75% of the total, contrasted to 97%. Thus a much higher percentage of children was receiving a more integrated elementary education, but those remaining were attending "blacker" schools.

By the time of trial further changes had occurred. Of the eleven schools, Morris had been taken out of the regular

elementary system and employed for Head Start and other programs. The average percentage of black children in the ten remaining schools had experienced a further increase, to 95%. At the same time, the total number of black children attending the schools had dropped from 6,474 in 1970 to 3,944 in 1972 while total non-white elementary attendance had increased from 5,278 in 1970 to 5,633 in 1972. Thus the ten remaining schools in 1972 held 65% of all non-white students, down from the 97% figure in 1965. Significantly, system-wide enrollment of white elementary students had dropped from 15,823 in 1965 to 12,409 in 1972, a decrease of over 3,000.

Other evidence and testimony indicated that the percentage rate increase in black school attendance is slackening, and that projections were that overall enrollment would decline, the current kindergarten class being the smallest in 25 years.

Prior to 1965, most black children at the junior high and high school levels were concentrated at South. There has been integration of high schools and progress toward integration at the junior, high and middle school levels. Nevertheless, South Middle continued to be approximately 95% black in 1970 and was attended by more than 50% of. all black middle and junior high school students in the system and still is.

## C. Finance

In terms of finance, the Grand Rapids School District enjoys a favorable position compared with the other eleven local school districts added as defendants in this lawsuit. Against an average of $17,038 equalized assessed valuation per child throughout the Intermediate District in 1972–1973, Grand Rapids had an equalized assessed valuation of $22,825 exceeded only by Kenowa Hills and Godwin Heights School Districts. Likewise, the Grand Rapids School District enjoys a favorable position in terms of general fund revenues per membership. At $1,-

191.03, the General Fund Revenues per child in the Grand Rapids District have been for the past two years the highest of any local school district in Kent County, compared with a county-wide average of $876.27. At the same time the total school millage burden for the Grand Rapids District at $28.60 remained in 1971–1972 below the $31.68 average for all 20 districts within the Kent Intermediate School District.

## IV. ALLEGED ACTS OF INTENTIONAL SEGREGATION

It is a claim of the plaintiffs that both by inaction and by action, the Grand Rapids Board throughout the years in question, confined black students to largely black schools, through the use, in the first instance, of a neighborhood school system in the elementary grades, through failure to avail themselves of opportunities to increase racial balance by changing boundary lines to favor that balance, by building and constructing schools or adding onto existing schools in such a way as to confine or lock in black students. Further, it is the claim of the plaintiffs that what efforts the Board has made and plans to make toward achieving greater racial balance are at the expense of the black students without a corresponding sharing of the burden by the whites, and finally that the justifications and explanations that are given by the Board are nothing but window dressing to obscure an invidious discriminatory intent on the part of the Board.

The Grand Rapids Board of Education admits the fact of racial imbalance, both in the residential patterns of the city and in the composition of the elementary, middle and junior high schools in the system. It is the Board's position that it has traditionally operated what is essentially a neighborhood school policy, color-blind for years and only more recently being oriented to affirmative action to relieve racial imbalance as the occasion arose. It is the Board's position that the persistent and conscientious efforts of the Grand Rapids Board to

achieve greater balance without other disruptive factors which have plagued communities of like size, has in fact achieved as salutary an effect in terms of racial balance as any other program attempted, without impairing the quality of education furnished all children within the system, and without denying to children for whose education it is responsible the equal protection of the law.

Plaintiffs called Gordon Foster, Professor of Education at the University of Miami, at Miami, Florida, as an expert in the fields of educational administration, school segregation and school desegregation. It was upon Dr. Foster's interpretation of the factual data presented that plaintiffs placed their greatest reliance to prove that in its attendance zones, school construction and addition policies, and other actions the Grand Rapids Board was guilty of segregative practices. The following exerpt from the cross-examination of Dr. Foster by Peter Armstrong, attorney for seven of the suburban school districts, will perhaps permit a narrowing of the issues:[9]

"Q I think both in this case and some of the other cases you have testified in, you have talked about what I think you have referred to as the classic techniques of segregation on the part of school districts, have you not?

A I have on some occasions. I am not sure if I did in this case or not.

Q I am not sure whether you did either, but as a result of your having looked at a number of school districts, you have identified certain things that you conceive go along with segregation, or establish segregation, is that right?

A Right.

Q One of these you have mentioned in some other cases is the concept of intact busing, is that right?

A That's right.

Q Where you bus black classrooms and it stays a black classroom in the receiving school, it that right?

A Right.

Q You didn't find any evidence of that here, did you?

A I was trying to remember. It seems to me there was one case that only lasted one month or two, or something, but I can't cite it, it's just—

Q Nothing that struck you as significant?

A Apparently not, or I would have had it.

Q You have also testified in other cases along this line of technique of busing black students past white schools that had capacity for them, to black schools, predominantly black schools, have you not?

A Correct.

Q This is one of the classic techniques, in your phrase?

A Right.

Q You didn't find any evidence of that here, did you?

A I don't believe so, no, sir.

Q You have also testified in other cases about large numbers of optional attendance zones, and in fact, you have found in some of the other situations you have looked at, schools that had many, many optional attendance zones in existence, have you not?

A Yes.

Q In this case, you have talked about one optional attendance zone that you considered to be significant?

A That's right.

Q Creston?

A Central.

Q Central. That is the only optional attendance zone you found

9. See March 7, 1973 transcript of Dr. Foster's testimony, p. 175 et seq.

here that you thought was significant in the context of your testimony, is that right?

A That is all I am aware of, yes.

Q You have also testified in other cases as to one of the classic techniques that speaks of segregation, the use of dual and multiple and overlapping attendance zones for situations where the school has no attendance zones at all, do you recall seeing this kind of thing in some of the other cases you have investigated?

A Yes.

Q You found none of that here, did you?

A No, sir.

Q You have also testified in other cases that one of the classic techniques of a difference in the physical quality of the schools and services that are rendered in the schools, comparing predominantly black schools with predominantly white schools, is that right?

A Yes, I believe so.

Q You didn't find any signficant evidence of that here, did you?

A In the data I have used, I would say generally not. The only possibility would be the fact that most of the schools that have been built since 1950 are white schools, almost all of them. As far as I know, only three black schools have been built and those were all primary units, except for Campau—well, that's a primary unit. To that extent, I think there has been a differential, otherwise, none.

Q Of course, you claim that those schools—you say also the fact that those schools were built and opened predominently black, those three you are talking about, represented some kind of segretory action on the Board's part, don't you?

A That's right.

Q Now, you also identify as one of the classic methods of—techniques of segregation de jure, the gerrymandering of attendance zones, is that right?

A That's right.

Q You didn't find at the elementary school level here anything that you would characterize as gerrymandering of attendance zones, did you?

A About the only possible instance of this, I testified to would have been the move in the south—between South Junior and Burton Junior High.

Q I am talking about elementary, now.

A Yes, but while the line was moved, this also changed the line for —no.

Q That didn't have anything to do with the elementary school zone, did it?

A Only in the feeder pattern sense, that's right, so I withdraw that statement.

Q So at the elementary level, you didn't find any gerrymandering of attendance zones, did you?

A Not generally.

Q When you say, "not generally", you didn't find any at all, did you?

A Not that I testified to, no.

Q And at the secondary level, you testified about the one or two in the 1950's, involving the zone between South Middle and Burton, or what was then South Middle and junior and high school in Burton?

A Right.

Q Right. And that is all you testified about as far as gerrymandering attendance zones?

A I believe that's right.

Q At the secondary level, is that right?

A I believe that's right.

Q You also identified as one of the classic techniques of segregation the use—discriminatory use of transfer policies and procedures, have you not?

A Yes.

Q You didn't find any evidence of that in this situation either, did you?

A No, sir.

Q You are an expert in educational administration, I believe, or this is your primary field of teaching, is it not?

A Yes.

Q Would you agree that the making of a decision as to the location of a new school, or the construction of additions to a school is a fairly complicated one that involves a number of factors?

A Yes.

Q And that you have to make projections based on the information that is available at the time as to the future enrollment patterns, population patterns, and so on?

A Correct.

Q Would you also agree that kind of decision, the location of a school, or the decision to make an addition to a school, in addition to being based on those factors, has to be based really on a look at the overall school system, that you cannot take one part of it and isolate it from the rest of the system and make a decision of that kind?

A I would agree with that, yes.

Q Really to evaluate any given site location, or decision to build or add to a school, you have to look at the whole system as it existed at that time, in the light of the building and projections that were being made at the time, do you not?

A Plus the educated guesses that you talk about for the future, yes."

It was Dr. Foster's opinion that in its constructions of new schools and additions to existing schools, the Grand Rapids Board was guilty of segregative practices which in effect confined the black population to black schools. Anyone examining his testimony must necessarily be cautioned to read it in its entirety, and against the entire record. It is also particularly necessary to evaluate his testimony covering the period since 1965, in terms of long-range planning then being considered by the Board and in the light of enrichment and compensatory programs which were then about to be undertaken by the Grand Rapids Board with state and federal assistance. The thrust of Dr. Foster's testimony was remedy, as was, indeed, the principal area of his expertise. While the issue of remedy in the lawsuit was reserved to later stages, a point consistently made by defense counsel, the court nevertheless considered it relevant and admissible as throwing light on any alternatives available from time to time, and consequently upon the motives, intent and effects of Board action.

Care must also be taken in understanding Dr. Foster's references to "segregated" and "desegregated" schools within the system, for in terms of percentages as a measure, his standard differs through his testimony. His inclusion of suburban, all-white, schools annexed to the Grand Rapids system as among those "opening segregated" must certainly be viewed with considerable skepticism when employed to support an inference of segregative intent on the part of the Grand Rapids Board.

Care had to be taken to recognize the continuing obligation of the Board to all students of lower SES (Socio-Economics Status), and to the existence within the community of other minority students, in the later years, factors fre-

quently overlooked when the focus is primarily black and white.

To anyone endeavoring with objectivity to consider the contentions of the parties, the most singular impression is of the unending dilemmas which face the school officials of a large urban system. It is altogether too easy for one, desiring in advance a particular result, to assign to any Board action that motive and that effect which most likely will support the personal predilection. Particularly difficult is the necessary task of examining Board action in the light of the circumstances as they existed at a given time, of alternatives available, of knowledge of what the future would or would not bring to the system, and of viewing each action or inaction in the light of its impact on the whole.

## A. Capacity

It became apparent early in the trial that the question of the student capacity of a given school at a given time would be hotly disputed by the parties, and it was. The issue assumes great importance in determining the motives and intent of Board action concerning attendance zones, additions to existing buildings, new construction, and feeder patterns. The facts were involved, but the question for the court's consideration was relatively simple: how, under the circumstances at a given time, would a school board fairly and realistically employ its available classroom space, without any intent to discriminate? And corollary to that question, if the Board's action did not appear to conform to that measure, to what extent is the difference attributable to an intent either to discriminate or perhaps to integrate?

The dispute centered mainly around the capacity of the "inner-city" schools.

Inner-city schools were eighteen schools in the central area of Grand Rapids which were designated target areas as measured by indices of poverty under federal and state guidelines, as

the court understands. These schools were: Sheldon, Henry, Vandenberg, Franklin, Sigsbee, Coit, Lexington, Strait, Kensington, Jefferson, Maplewood, Campau, Alexander, Morris, Madison, Stocking, Hall and Colbrook. In 1966 these schools were placed under the supervision of Joseph H. McMillan as Director of Inner-City schools. It was Dr. McMillan's task to coordinate and take advantage of developing federal and state programs specifically aimed at such areas.

The criteria were not racial, although student attendance in the schools was about 50% black at the time. The federal criteria was socio-economic status (SES), based upon income level, number of broken families, family education levels and other like factors.

In their proofs and arguments with respect to over and under-utilization, plaintiffs rely upon "standard capacity" figures, a measure which defendants urge is completely unrealistic when applied for the purposes of this case, especially to the inner-city schools.

The "standard rated classroom capacity" of a given school is reported by the District through the Intermediate School Board and hence to the State as part of its overall statistical compilations. The proofs established that the system of evaluating schools by standard rate of capacity is one which commenced in 1963 or 1964 on a nationwide basis so as to bring some uniformity to nationwide and statewide school statistics. Thus, each classroom is presumed to be suitable to accommodate 30 students and the standard rated capacity of a given school is basically the product of the number of rooms times 30.

The plaintiffs make their case for under-utilization upon a simple comparison between the standard rated capacity of a given school and the actual enrollment. For anything but the broadest statistical purposes, the rate of capacities of schools, particularly older schools, are totally inadequate tools for

measuring over-utilization or under-utilization of a school. In fact, it is almost necessary to examine each school individually in the light of its present and potential use, room by room, to make any intelligent conclusion on this question. Many variant circumstances arise to affect the judgment. In the first place, an unerring ability, uniformly and without variation, to place 30 school children in each classroom throughout a given district is, of course, unrealistic. Variations will inevitably occur. School rooms themselves differ in size and layout from room to room and from school to school.

Being older, it is logical to observe that inner-city schools would not have been designed for the variety of programs which have been provided in schools more recently. Thus, what happens when enrichment programs such as music or art are added? Or laboratories? Or lunchrooms? Or gymnasiums? What happens when one room is ued for morning and afternoon kindergarten classes? What about administrative offices? Can a manual arts or home economics class house as many students in the same space as regular fifth grade scholastic studies? What happens when certain imaginative programs are introduced in the system which may require fewer or greater numbers of students in a given room according to an optimum size for a particular program?

Further complicating the situation was the decision of the Grand Rapids Board to reduce the student-teacher ratios within the inner-city schools to 23 or 25 to 1, in the middle-city to 25 or 27 to 1 and to establish it at 30 to 1 in the outer areas.

The conclusion to recognize the need for more personal attention in the inner-city schools, seems to be a wise one, on the face of it. It is not at all illogical to conclude that children in the inner-city who come from more modest social and economic backgrounds may, indeed, need better guidance and the educational wisdom of this decision of the Board is unchallenged. Dr. McMillan acknowledged the desirability of this. If, in fact, there are twenty rooms in an inner-city school and the 23 to 1 ratio is maintained, does it therefore follow that the school is under-utilized to the extent of 140 students? What happens when the students in the inner-city school complain that there is less area of playground space per child available to them than is available in a new school which has been built toward the outskirts of town? It cost $100,000 per acre for additional land for Jefferson School as against $4–5,000 per acre farther out.

According to Mr. Runkel, Grand Rapids was one of the early leaders in the Head Start Program, the value of which is almost universally conceded as a vital tool in giving the very youngest children in economically depressed areas a chance to enter the school system more on a par with their peers. Where and what classrooms will be used for these youngsters? The myriad special programs, both compensatory and enriching, as well as those programs which are designed to bring parents in closer communication with the school system and to render them assistance, are discussed elsewhere, but it must be apparent that the influx of this type of effort had to have profound effect upon the utilization of school space and most particularly within the inner-city where they would be most accessible to those in need.

Dr. Foster's testimony was useful to the court in understanding techniques of integration and segregation generally, and his criticism of Board action from time to time was helpful in enabling the court to scrutinize more precisely those actions which were charged to be discriminatory. His opinion testimony, however, was based primarily upon standard capacity figures and accordingly could at best be no more valid than the facts upon which he relied.

The court concludes that the schools in the inner-city were overcrowd-

ed during most of the time involved. The court also concludes that they still would be overcrowded, but for the efforts which the Board has made to transport school children within the inner-city to schools without. At the same time there is a truth in plaintiffs' observations that inner-city schools to some measurable extent presently are under-utilized, even taking into account all of the foregoing factors. The present under-utilization is nowhere near that proportion claimed by plaintiffs. At the same time, it exists, and it is primarily because the Board is endeavoring to give more and more elementary school children of low SES within the inner-city a broader experience at an earlier level. It exists also because of Board reluctance to bring in and exchange students from the outer areas of the school district, and this reluctance is based primarily upon an apprehension that by doing so, an outflow of white population from the district will be generated and will, in the end, be self-defeating of their ultimate purposes. The extent to which such apprehension may be reasonable or justified and the court's opinion as to whether such is a permissible consideration by a school board in its efforts to eliminate racial imbalance in its school system is discussed *infra*.

### B. School Construction

Plaintiffs, mostly through the testimony of Dr. Foster, criticize the actions of the Grand Rapids Board in the construction of new schools and additions to existing schools which took place from 1950 to date. They claim essentially that these activities tended to compact and hence confine the black population and prevent its more even distribution throughout the school district. They point to numerous additions to schools which were predominantly black or predominantly white, such as Huff School in 1951 and 1955; Sheldon School in 1955; Campau Park School in 1965; Madison Park in 1958, 1961 and 1967; Henry School, Jefferson School and many others. They point to the construction in predominantly black neighborhoods of Campau Park and Maplewood Schools, especially, and of Roosevelt Park School which was to share the Hall School zone.

The charge demanded close scrutiny by the court, because caselaw and expert testimony reveals that construction policies can be strongly indicative of proper or improper intent on the part of school boards. Following the trial, the court reviewed all of the testimony, its notes, and the exhibits, matching them against one another in order to make what has to be, essentially, a value judgment. The construction of Campau School in 1956 particularly had to be scrutinized because it was the subject of controversy at the time.

Campau School and other early school construction and addition must be understood in the light of conditions as they were developing in the early 1950's. The post-World War II baby boom was having its effect, as was the rapid influx of black citizens into the inner-city and the corresponding concentration of children in residential neighborhoods far greater than had existed before. Concepts of walk-in, or neighborhood schools, were firmly established. World War II had seen the suspension of much needed school construction, generally, and the immediate need was especially felt at the elementary or even early elementary level.

The conclusions of plaintiffs and Dr. Foster notwithstanding, the proofs clearly indicate a Board desire to place the schools and the additions to existing schools where the children were, regardless of race. The site for Maplewood School had been acquired years before. Construction of Campau School was apparently in accord with the recommendations of a study by the University of Chicago, a circumstance which Dr. Foster dismissed by the unsupported inference that the recommendation had to be colored by the fact that the Board commissioned and paid for the study, a condition which he did not see as affecting his own objectivity. It is apparent that any possible alternatives would have

drawn the same objection. Campau School was well built and similar in design and quality to schools being built farther out in the city to meet expanding needs there. Failure to build new schools in predominantly black neighborhoods would undoubtedly have brought claims of discrimination in view of new construction elsewhere. So would have efforts to require black children, particularly the younger ones, to walk to adjoining schools, also overcrowded, or to new schools built at more distant peripheries.

The several decisions objected to may, or may not have been naive, based upon hindsight and later experience and educational concepts. The court is unable, however, to find that they were motivated by segregative intent. To determine otherwise, it is necessary to find that, for all practical purposes, the Grand Rapids Board had an affirmative duty at the time to abandon its neighborhood school concepts and to institute cross-transportation of nearly all school children at the elementary level as soon as the growing racial disproportion in the residential population first became apparent. In the context of the times, it was unrealistic.

### C. The Joint Policy Statement and the Master Plan

On April 23, 1966, the Michigan State Board of Education and the Michigan Civil Rights Commission adopted a Joint Policy Statement which reads as follows:

"In the field of public education Michigan's Constitution and laws guarantee every citizen the right to equal educational opportunities without discrimination because of race, religion, color, or natural origin. Two departments of state government share responsibility for upholding this guarantee. The State Board of Education has a constitutional charge to provide leadership and general supervision over all public education, while the Michigan Civil Rights Commission is charged with securing and protecting the civil right to education.

"In addition to the declaration of public policy at the State level, the United States Supreme Court, in the case of Brown vs. Board of Education, ruled: 'that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal.'

"The State Board of Education and the Michigan Civil Rights Commission hold that the segregation of students in educational programs seriously interferes with the achievement of the equal opportunity guarantee of this State and that segregated schools fail to provide maximum opportunity for the full development of human resources in a democratic society.

"The State Board of Education and the Civil Rights Commission jointly pledge themselves to the full use of their powers in working for the complete elimination of existing racial segregation and discrimination in Michigan's public schools. It shall be the declared policy of the State Board of Education that in programs administered, supervised, or controlled by the Department of Education, every effort shall be made to prevent and to eliminate segregation of children and staff on account of race or color.

"While recognizing that racial imbalance in Michigan schools is closely related to residential segregation patterns, the State Board of Education and the Civil Rights Commission propose that creative efforts by individual school districts are essential and can do much to reduce or eliminate segregation. Local school boards must consider the factor of racial balance along with other educational considerations in making decisions about selection of new school sites, expansion of present facilities, reorganization of school attendance districts, and the

transfer of pupils from overcrowded facilities. Each of these situations presents an opportunity for integration.

"The State Board of Education and the Civil Rights Commission emphasize also the importance of democratic personnel practices in achieving integration. This requires making affirmative efforts to attract members of minority groups. Staff integration is a necessary objective to be considered by administrators in recruiting, assigning, and promoting personnel. Fair employment practices are not only required by law; they are educationally sound.

"The State Board of Education and the Civil Rights Commission further urge local school districts to select instructional materials which encourage respect for diversity of social experience through text and illustrations and reflect the contributions of minority group members to our history and culture. A number of criteria are enumerated in "Guidelines for the Selection of Human Relations Content in Textbooks", published by the Michigan Department of Education.

"The State Board of Education and the Civil Rights Commission believe that data must be collected periodically to show the racial composition of student bodies and personnel in all public schools, as a base line against which future progress can be measured. Both agencies will begin next month to assemble information on the present situation.

"To implement these policies the State Board of Education has assigned staff of the Department of Education to work cooperatively with the Civil Rights Commission and local school authorities for the purpose of achieving integration at all levels of school activity. The Michigan Civil Rights Commission also stands ready to assist local school boards in defining problem areas and moving affirmatively to achieve quality integrated education."

Prior to the 1966 Joint Policy Statement, the Grand Rapids Board had already been studying the racial imbalance which existed within the system in connection with long-range plans for school construction. It had in June, 1965, appointed Dr. Donald Leu and Dr. John McNicholas of Michigan State University to survey and report upon its secondary school needs. That report was completed and presented to the Grand Rapids Board of Education in August 1966.

On November 1, 1965 the Grand Rapids Board had also appointed a committee to study, specifically, racial imbalance in the Grand Rapids Public Schools. The report and recommendations contained therein were called the Racial Imbalance Study, which was submitted to the Board on June 13, 1966. (PX 33)

The Joint Policy Statement, studies by Drs. Leu and McNicholas, and the Racial Imbalance Report led to the preparation and, on June 3, 1968, the adoption by the Grand Rapids Board of the Proposed School Organization and Construction Plan, commonly referred to as the "Master Plan". (PX 39).

Portions of the Master Plan are attached hereto as Appendix B, but a complete understanding of it, its history, and the reasons for its preparation can only be gained from a reading of the entire document.

Organizationally, the schools were to work toward separate schools for Early Elementary (Pre-kindergarten) to Third Grade, Elementary Schools (3–5 or K–5), Middle Schools (6–8, replacing former junior high schools) and High Schools (9–12). Early Elementary schools were to be designed fundamentally on a neighborhood basis, and in the inner-city particularly, to be coordinated with parent participation programs, Head Start and Follow Through, and programs to improve language skills to enable those children to compete more successfully in later grades.

The elementary schools (K-5 and 3-5) were to provide a wide integration experience, to be less compensatory and more competitive, and were to have a broadened curriculum in art, science, music and physical education. Use of Open Space Land Grant monies would permit expansion of 16 elementary sites, thirteen of them in the inner-city.

The middle school concept was to replace the idea of the junior high school, following the recommendations of Dr. Leu, as adopted by the Board on October 3, 1966. As shown by Appendix IV to the Master Plan, the concepts were broad in scope, involving classroom size, curriculum and staff and having as an important element the elimination of the grade retention and failure problems evident at that age.

At the high school level it was proposed that South High be phased out and closed, and that there would eventually be three high schools, Creston, Union and Ottawa. Central High School would be converted into an educational park for general enrichment of curriculum by offering more specialized and advanced courses available to all students throughout the system, such as advanced languages, anthropology, computer math, etc. Educational Park would work closely in conjunction with Grand Rapids Junior College and could tie in with its facilities, staff as well as cultural institutions in downtown Grand Rapids.

In timing, implementation of the Master Plan was to proceed in four basic stages: immediate action, and three phases of future action, spread out from 1970 to 1976.

Presentation of the plan to the public was made by a series of meetings in schools throughout the city. Marvin Tableman, then Special Assistant to the Michigan Superintendent of Public Instruction and in charge of Economic Educational Opportunities Programs for the State of Michigan worked both on the plan itself and its presentation to the public. Mr. Tableman, speaking on behalf of the State Board of Education, urged approval of the plan, stating that "Adoption of this plan and necessary steps to implement it will be an affirmative response to the permanent necessity to provide a quality, integrated education". (PX 31G, p. 288).

It was a part of Mr. Tableman's duties to work with the Michigan Civil Rights Commission, the State Board of Education and with local school boards to implement the Joint Policy Statement as provided in the last paragraph thereof. Mr. Tableman had also been a member of the court-appointed team to prepare a metropolitan desegregation plan in Detroit.

The immediate plans and first phase of the Master Plan were carried out, but later phases have been held up. It is the position of the Grand Rapids Board that the intervention of this lawsuit in 1970 made further implementation hazardous and that many aspects of it have also been shown either to be unworkable or in need of change in view of the passage of time. The need for periodic review and revision was recognized in the plan itself.

The changes which have taken place since 1968 under the Master Plan and otherwise, through the activities of the Grand Rapids Board of Education are too extensive to be set forth in detail here. Basically, they are described by Milton Miller in his testimony given on February 15, 1973, and appearing mainly commencing at page 81 of the transcript for that day and continuing through page 189.

In summary, the action of the Grand Rapids Board in achieving a greater measure of racial balance in its public schools since 1965 must be characterized as impressive although far from complete in terms of eliminating racial imbalance within the inner-city schools.

The record in the case shows strong dissatisfaction with the closing of South High School and its continued employment as a middle school. The results, at the high school were effectively to achieve a substantial racial balance among the four remaining high schools,

but it was the claim of the plaintiffs' witnesses that by closing down South as a high school, the result was to leave the middle school, which remained, almost totally black, whereas before there was at least a minimum of white attendance. In this connection it should be remembered that there was no effect whatsoever upon the racial composition of the middle school classes. The change had the benefit of achieving a degree of racial balance which could not otherwise have been achieved. South High School was rapidly turning completely black, and the low retention rate of white students who would normally have gone to South from its feeder schools gave just cause for concern. The rebuilding and relocation of Union High and Ottawa High and redistribution of students to achieve better balance has been, on the whole, highly successful. It has to be acknowledged, however, that the closing of South as a high school did nothing whatsoever, one way or the other, for the racial balance of South Middle School.

The extent of progress in achieving racial balance throughout Grand Rapids schools since 1965 is dramatically shown by Grand Rapids Exhibits 13, 14 and 15, showing on maps the racial composition in 1965–1966 and 1972–1973 of the elementary, junior and middle, and high schools, respectively. Plaintiffs quite properly point out that the maps are inadequate to show the specific concentrations which still remain. They also note that the actual percentages employed include all minority groups and would be different, again, if only cast in terms of black and non-black. However, a measure of the scope of the challenge to the Board must necessarily include all minority groups and not just the black. Exhibit 13 shows 11 of 51 schools in 1965–66 as having over 10% minority attendance. The same exhibit shows that in 1972–73 ten of 54 schools had between 5% and 10% minority and 31 schools had over 10%. Exhibit 14 shows that in 1965–66 one of five middle or junior high schools had between 5% and 10%

minority attendance while four of eleven had over 10%. In 1972–73, one of nine schools had between 5% and 10% minority attendance and five of the nine had over 10%. On a geographic basis, the spread of minority children into schools throughout the city has been caused to extend geographically well beyond their residential patterns.

At the same time, it is idle to pretend that full racial balance has been achieved, at least at the elementary and junior-middle levels.

It is also true, that in many schools having a better racial balance, it has been achieved by transporting black children to them from the inner-city school attendance areas, i. e. Alger (11%), Crestview (27.9%) Michigan Oak (26.-9%), Ridgemoore (25.6%) and Wellerwood (23.1%). Sherwood Park, at 18.-1% black in 1972–73 received those students on an open enrollment policy at their option from Buchanan, Dickinson, Jefferson, Madison, Oakdale, Sheldon and Sigsbee Schools.

A somewhat similar pattern is seen at the junior high-middle school level, with a substantial broadening of racial composition in most schools, but a continuing high (97.4%) black student attendance at South Middle. Iroquois Middle School at 38.2% black and 39.2% minority is next highest with white students being transported in to improve the racial balance there.

Most of the improved racial balance, claims the Grand Rapids Board, comes about from efforts to relieve overcrowding of the inner-city schools and the conscious decision to take advantage of the situation to improve racial balance by feeder patterns to outlying schools.

As previously mentioned, one immediate impact of the Master Plan and Board action was to reduce teacher-student classroom ratios. This change was bound to and did require an extensive out-migration of the children in the inner-city schools. A budget crisis in 1967 had, according to Milton

Miller, curtailed activities throughout the system that year, but eased later and in 1968 permitted not only reduced ratios as planned, but the reinstatement or creation of need art, music and library facilities which had been pre-empted for classroom use during or prior to the austerity period. Head Start and Follow Through programs necessarily took up a great deal of space, and Maplewood School, the source of friction when it was built in the 1950's, was turned over completely to Follow Through programs.

The thrust of the plaintiffs' complaints concerning Board action since 1968 has been directed at the claim that the Master Plan, and implementation of it to date has contemplated a dispersal of the inner-city children to schools at the periphery of the district and would mean transportation of black children out without a corresponding reciprocal obligation on the part of white children. To a considerable extent this is true. The Master Plan would see the replacement of Alexander, Straight, Coit, Sigsbee, and Jefferson · Schools with completely new structures, but limited to K–3 enrollments. It would see neighborhood schools limited in the inner-city to the lower grades with transportation out commencing at the third grade. While the standard is related not to race, but to SES (Socio-Economic Status) and while Straight is now 91.7% white and Coit is 89.8% white, the black school children would be most affected.

The court finds that by use of transportation, the Board has substantially reduced the overall attendance in the inner-city schools and that the extent of it goes beyond the mere need to reduce overcrowding, urged as the reason by the Board. Recognizing that, for the inner-city schools the use of standard capacity is highly unrealistic in terms of effective educational needs, nevertheless the court is satisfied that by and large, the schools are under-utilized in terms of effective capacity.

If the foregoing is so why? Several reasons suggest themselves, but one is dominant. On a long-range planning basis, the Board desired to achieve better racial balance within the system. There was space available to achieve this in schools which were predominantly white. It tied in with the Master Plan. The court finds, however, that the intent and purpose of both the Master Plan and the implementation to date is to achieve a maximum amount of racial balance within the system without compelling white students to be transported into schools in the predominantly black residential areas, out of fear that by doing so, such action would generate an exodus of whites from the system and hence be self-defeating. The apprehension clearly appears throughout the documentary evidence submitted during the trial and in the testimony of the witnesses.

Is the concern justified in fact? Would the Board of Education of a city school district, under the facts here, be warranted in concluding that there was sufficient danger to the success of integration efforts to consider it and to take precautions to avoid it? The legal implications will be discussed later.

Grand Rapids School District Superintendent Philip Runkel testified that, based upon racial-ethnic census figures, the system lost 2,279 white students in the last two years, a loss which he characterized as "white flight", and inferred at least it was a flight to the suburbs in order to escape the apprehended effects of desegregation. He also indicated that the parochial schools as well as the suburban school districts were recipients of the exodus. He further opined that had it not been for annexations to the Grand Rapids District in the early sixties, the district would now be 50% non-white. As brought out by the cross-examination of the superintendent and other evidence in the case, the extent of any "white flight" as testified to by Mr. Runkel is substantially overstated. It is nonetheless true as in-

dicated earlier that since reaching a high point in 1966–1967, white enrollment in Grand Rapids schools has steadily decreased. The inference that decreased white attendance is solely attributable to movement to the suburbs must be tempered by the fact that, during the same period, there was a net increase of public school enrollment within the eleven added suburban school districts of only 1,582. The decrease, county-wide, in parochial school enrollment has been also noted, as has the declining birth rate.

■ From the record, however, including the statistical data, Board Minutes, testimony of witnesses and examination overall of the changing racial patterns of schools in the system, the court finds by a preponderance of the evidence that the decrease in white school enrollment within the Grand Rapids School District has been substantially motivated to a significant degree by public apprehension over the possibility of undesired integration efforts. Whether the apprehension in the public mind is justified in fact or not, or whether it is right or wrong on moral grounds is immaterial here. The court finds that the existence of the fact of the apprehension and its scope were such it could not rationally be ignored by a school board charged with the constitutional duty of maintaining a unitary school system. Neither under the circumstances could it rationally be ignored by a school board endeavoring to correct racial imbalance within its boundaries, whether of its own volition, as here, or under constitutional mandate.

## D. *Optional Attendance Areas*

■ Wide-scale use of optional attendance areas is one of the classic indices of a dual system. Thus, careful scrutiny has been given all evidence regarding such options in this case. In Grand Rapids, except for one instance, the only attendance options granted were temporary options of three years duration or less to enable the school children attending a given school to continue on to completion in that school, notwithstanding a change in the attendance zone which came after they first enrolled. These option zones were created at the time of the realignment of the high school zones with middle and elementary school zones. Nearly all have by their own terms now expired. The creation of these temporary optional attendance zones, the court finds had neither any segregative or even integrative intent or effect. It reflects recognition that a child once enrolled in a given school may very well wish to finish out in the same school. The provision is normal and educationally sound and was not seriously complained of during the trial.

The only other optional attendance zone involved in the lawsuit is the creation in 1970 of an optional attendance zone in the Creston High-Central High attendance area: Before 1970 the area had been a part of Central. Central High School at the time was 22.4% black and Creston was 7.9%.

The optional attendance area is best described as the north half of the Beckwith Elementary School attendance zone (and seen by placing overlays PX 7B5 and PX 7D5 over base map PX 82) bounded generally on the south by Leonard Street, on the west by Fuller Avenue, on the north by Sweet Street and extending on a line projected from Sweet Street almost directly east to and in line with the Grand Rapids city limits. The easterly boundaries of the area are those of the Grand Rapids city limits at East Beltline Avenue.

It is the claim of the plaintiffs that the creation of this zone was segregative in intent and effect. Thus, there was much argument and testimony concerning the creation of this area, its purpose and its effect.

First, care must be taken in evaluating the racial makeup of the area involved, especially in the light of the 1970 population base map, PX 7A, in which a large geographical area is apparently under one census tract and is shown to be between 5% and 24.9% black in 1970. Refer to the far more re-

fined 1970 population base map, PX 82, as it shows where the concentrations of black population actually reside on a block-by-block basis and from this an entirely different picture is drawn of the makeup of the area. It will thus be seen that there is a concentration of blacks between 5% to 24.9% and 25% to 49.9% within the optional attendance zone, but lying almost entirely on the west end of the optional zone. Directly to the north thereof there is likewise a higher concentration of black residents and this has been attributed to the presence of a private integrated housing project, Auburn Heights Subdivision. So far as is known, however, no part of that subdivision lies within the optional zone. Further examination of the optional area shows that the rest of the residential area appears largely to be within a subdivision within the center of the zone, and having less than 5% black population. The other areas, also with less than 5% black population, appear to be largely uninhabited and devoted to non-residential uses as evidenced by the absence of any streets therein.

In 1970, a group of parents approached the Grand Rapids Board of Education and requested that the particular area be assigned to the Creston High School attendance area. It is the position of the Board that at the time, Central High was overcrowded and that it was desired to establish an Educational Park for enrichment programs applicable to the District as a whole and that Central High, being closest to other useful areas, particularly art galleries and the Junior College, was best suited to house the Park until it could get its own facility. Thus, claims the School Board, whether the request initiated the decision or not, the creation of an optional attendance zone in this area would help to free space in Central High School and in its judgment, not appreciably affect the racial balance between the two schools.

Both Creston High School and Central High School are within acceptable ranges of integration due mostly to the transfer of a large area of the inner-city school population to the Creston High School which otherwise would be largely white.

The challenged optional zone is somewhat closer to Creston than Central. While the optional zone area is geographically large, it has a very low population density.

It was Milton Miller's testimony that the request was made by parents of children who would thus, by the zone change, be able to walk to Creston. As indicated, the west side of the area, which is closest to Creston, is by 1970 census 5–24.9% black. The race of those parents making the request and their reasons, other than proximity of Creston, are not established by the record.

The decision to establish the Educational Park in Central High School, pending the creation of another structure, was logical. Less certain, however, is the claim that by permitting an option in this area, there would be enough relief of overcrowding at Central to provide for the necessary classroom space which was desired for the Educational Park at Central. The statistics show that all four high schools were in fact enrolled in excess of their standard rated capacity (see PX 29F). Of the high schools, Central at 1975 in 1970 had the highest total enrollment and Creston, at 1578, the lowest.

No precise statistics were furnished, but according to Milton Miller, there were five or six black high school students in the area at the time and of the total students in the area, about half, 35 to 40, optioned to attend Creston. As to the exact racial composition of the area, Superintendent Runkel and Mr. Miller were not in agreement either as to the number or as to the dynamics of change. Generally, Mr. Runkel had concluded that there was a substantial black population in the attendance area, whereas Mr. Miller's observation was that it was less substantial. Runkel was under the impression that the area was relatively stable, whereas Miller was of the opinion that

the black population there was slowly increasing.

Miller, whose familiarity with residential patterns has been noted earlier, acknowledged that the area affected was mostly white and that the estimates of black population within it, even though it might be growing, was nevertheless somewhat exaggerated. He was personally acquainted with five or six black families who had moved in in the last few years. He did not appear to be concerned about the situation one way or the other, but simply accepted it for whatever it was.

It is a logical explanation that the Grand Rapids School officials, looking at the area involved and considering it from the point of integration as against segration, simply concluded that it made no difference one way or the other, while it contributed at least in part to the solution of an immediate problem caused by the Educational Park. It is also suggested that the school administration may have felt that if at least a portion of the optional zone was enjoying an increased number of black residents, long-range integration purposes would be better served by placing them in the "whiter" Creston area, thus contributing eventually perhaps to a better racial balance. It is more likely, however, that this conclusion was reached later in connection with Board consideration of eliminating the optional feature and including the area within the Creston zone completely. Presently this is only a recommendation of the Building Use Committee.

■ From the foregoing, the court concludes that the criteria of the school administration in granting the option and in considering attaching the area to the Creston zone were at least completely neutral and that there is no credible evidence to support a rational inference of racial overtones or bias in the decision. The absence of any other optional zones and evidence that similar requests with respect to Iroquois Middle School were resisted further support the finding.

## E. Special Schools

■ Only limited mention need be made of the ten special schools operated by the Grand Rapids system, e. g. the orthopedic school, homebound program, school for the oral deaf, for unwed mothers, and the like. Likewise, much testimony was received concerning Educational Park, the Skill Center and programs carried out within the District in cooperation with the Kent Intermediate School District. The totality of evidence shows a highly sophisticated system offering a remarkable diversity of educational opportunities to students in Grand Rapids. So far as the court has been able to ascertain, all are fully integrated both as to staff, faculty and student participation.

It is especially noteworthy that minority students comprise about 20% of those availing themselves of the advanced and special educational studies taught at Educational Park.

## F. Student Transfer Policies

■ During the trial Ella Mary Sims, a plaintiff, testified as to her experience with her children in the Grand Rapids School system. Mrs. Sims testified that while her two boys were at South Middle School, she became dissatisfied with the discipline there and with the management of the school library. Accordingly, she asked to have her boys transferred to Northeast Middle School, a predominantly white school. She testified that her request could not be honored unless she could obtain a doctor's statement or letter saying it was necessary. It was her testimony that she did obtain such a letter and that, on the basis of that, the boys were transferred to Northeast Middle.

While there had been no claim in the pleadings and proofs concerning the discriminatory use of medical transfers, nevertheless the court advised counsel

for all parties that it would permit the re-opening of discovery and allow amendment of pleadings if there was any evidence of use of medical transfers in order to increase segregation. No further evidence of this practice was forthcoming and as the record stands, there is no claim or proof of such practice within the Grand Rapids School District, the only evidence of the use of medical transfers at all being the one instance in which two black children were permitted on medical transfers to transfer from a predominantly black to a predominantly white middle school.

There was evidence that between 20 and 30 students residing in Grand Rapids have attended East Grand Rapids schools as tuition students. This is allowed where their parents own real estate in the school district and tuition charges are reduced by the amount of school tax paid on the property. This practice has existed for over 30 years. There is no evidence that the race of a child was a factor. The number of tuition students so accepted has been relatively stable over the years.

Dr. Gordon Foster, testifying as an expert for the plaintiffs, found no discriminatory use of transfer policies and procedures (Foster 3/6/73, p. 180). Neither does the court.

### G. *Senate Bill 1100*

Plaintiffs claim as discriminatory toward them, the active support by several of the defendant suburban school districts, of Senate Bill 1100 (exhibit PX 38) which, as modified, became Act 177 of the Public Acts of 1962.

Prior to 1963 Section 143 of the School Code of 1955 provided that "whenever territory shall be annexed to a city comprising a school district of the second class, such territory, by such annexation, shall become and be part of the school district of that city".

At the time of the passage of the 1962 Act, only two cities in Michigan, by reason of their population, were second class school districts, those being Flint and Grand Rapids.

Senate Bill 1100, as enacted, eliminated that section of the Code which had theretofore made the boundaries of the Grand Rapids School District by law coterminous with the municipal boundaries of the City of Grand Rapids, by providing in section 146, that the annexation and property transfer provisions of the school code which were applicable to other districts in the State should thereafter apply also to second class school districts. M.C.L.A. § 340.146; M.S.A. § 15.3146.

Certain of the suburban school district defendants, Godwin Heights, Forest Hills, Grandville, Kentwood, Northview ond others, supported Senate Bill 1100 and contributed to attorney fees in connection wtih the drafting and presentation of the Bill. It is this action which the plaintiffs claim tended to lock in the City of Grand Rapids and the Grand Rapids School District with the effect of increasing segregation and further contributing to the segregation of black students within the City of Grand Rapids.

A careful review of the proofs and understanding of the Bill is convincing that such was neither the purpose, nor the effect of the Act. There is simply no evidence whatsoever that the Bill, or the defendants' support of it, had as its purpose in any respect or to any degree, any racial or discriminatory factors insofar as plaintiffs and their class are concerned.

The real reason for the support of the Bill is manifest in the 54-page transcript of the hearing on the Bill held before the Senate Education Committee on Wednesday, March 15, 1961 (PX 40). The local suburban school districts had as their motive concern for the loss of their tax base by piecemeal annexation under existing municipal annexation procedures. Prior to the Act, a number of annexations to the City of Grand Rapids had taken place which removed

substantial tax base from some of the defendant districts while accepting a disproportionately small number of children from those districts, thus having the effect of significantly reducing the state equalized valuation per child in those districts. A number of such annexations, it was claimed, involved small, and in some cases, uninhabited areas having industrial development or other substantial tax base.

Paul O. Strawhecker, attorney, and drafter of Senate Bill 1100 testified on behalf of those local school districts whom he represented. It was his testimony before the Senate Committee that unless the Bill were enacted, the following months would see a vote upon 12 petitions proposing annexation of territory to the City of Grand Rapids under the Home Rule Act. Eleven of the petitions proposed the annexation of territory in Paris Township, immediately to the south of the city. One related to territory in Walker Township to the northwest. Six of the eleven petitions would have affected the Godwin Heights School District. The petitions, if favorably acted upon, according to Strawhecker, would have taken from that school district $13,960,713 in state equalized valuation, being 19.5% of the total valuation of the school district and 44.-75% of its valuation in Paris Township. The annexation, while taking that high a percentage of the state equalized valuation from the School District, would, in fact, only have taken 119 children or 3.-65% of the 3,258 children in the school district. Similar claims were made on behalf of the other school districts opposing the Bill.

The merits of the particular law are a political question which was decided in a political forum. However viewed, it is completely apparent that the motive, at least, was a very legitimate desire of local school districts to protect their own tax base. There is not one suggestion of racial bias in the entire proceedings and none is inferable either in purpose or effect.

### H. Recruitment and Assignment of Faculty

Plaintiffs claim that the Grand Rapids Board originally resisted all efforts of qualified black teachers to obtain employment in the system, failed for years to recruit black teachers, and later failed to do so in sufficient quantity. Finally, it is claimed that the Grand Rapids Board has pursued a constitutionally impermissible policy of placing black teachers almost exclusively in predominantly black schools.

#### 1. Recruitment

The evidence on this issue goes back to the 1940's, during which time the total black population in the City of Grand Rapids rose from 1,660 (1%) in 1940 to 7,075 (4%) in 1950.

What little proof there is of practices in the 1940's comes from Margaret Lewis and Esther Smith. While most, if not all, of the conversations testified to were with persons since deceased, the picture is one of school board resistance during that period to the hiring of black school teachers.

Mrs. Lewis gave an account of a short informal meeting with Grand Rapids Superintendent Krause in 1945. She was then attending college in St. Louis, Missouri and, accompanied by Episcopal Bishop Whittemore and Joshua Bell, a black leader, she inquired about a teaching position in Grand Rapids upon her graduation. Mrs. Lewis related that the superintendent's response was that she need make no formal application since he would never hire a negro anyway. Nevertheless, Mrs. Lewis was, in fact, hired upon her graduation in 1947 and by Superintendent Krause. She has been with the system ever since. She was first assigned to Henry School as a first and second grade teacher and was there five years, Henry being at the time a little under 50% black. She then went to Franklin School and while at Franklin, Dr. Benjamin Buikema, then the superintendent of the Grand Rapids

School District, came to her and asked her if she would "open the way" at Sigsbee School. Sigsbee was white and the move was an open attempt to overcome white resistance to black teachers, using Mrs. Lewis to spearhead the move. Mrs. Lewis, after succeeding at Sigsbee, was asked by Dr. Buikema if she was game "to open up Burton School" and she readily agreed, thus becoming the first black junior high school teacher in Grand Rapids. Burton was at the time 100% white. Mrs. Lewis' testimony should be read by anyone who doubts the ability of a black teacher to be effective and achieve acceptance in a predominantly white school.

Esther Smith, black, testified to seeking employment in 1938 with the Grand Rapids Board and characterized it as a "farce". She testified that there were no openings, whereupon she went to Chicago where she worked until returning to Grand Rapids in 1946. At that time she stated she was told that the Board would not hire "colored teachers". There is no evidence to indicate whether or not there were in fact openings for school teachers when Mrs. Smith first contacted the Board in 1938. Her first written formal application was in 1960 or 1961 following her receipt of a life certificate in Special Education in 1960. She was, in fact, hired and has been with the system ever since.

Proof of personal experiences and other evidence concerning faculty hiring and assignments was much more extensive for the period following 1950. The story is one of increasing black population, increasing insistence by the black community on the hiring of black teachers, and increasing sensitivity by the Grand Rapids Board of Education to these demands.

Recruiting of faculty by the Grand Rapids Board prior to 1964 was limited generally to Michigan colleges, together with colleges in states which were certified by the Michigan State Board of Education as having equivalency, in terms of teacher training, with Michi-

gan. All of these states were northern states with the exception of Kentucky.

Donald J. Schreimer, since 1964 Director of Personnel, testified extensively concerning recruiting and assignment practices. He testified to efforts in 1961, when he recruited at Kentucky State in Frankfort and Wilberforce University, near Cincinnati. The efforts resulted in an increase of ten in black faculty.

It is clear that in the early and mid-1960's there was a shortage of qualified teachers, black and white. Testimony indicated that during that period, the Grand Rapids Board attempted to recruit anyone whom it thought could be qualified under Michigan standards as a certified teacher, even to the extent of taking persnos on a provisional basis, with the understanding that they would upgrade themselves during the term of their employment so as to become fully certificated under Michigan requirements. Such a procedure was recognized and allowed by the Michigan State Board of Education during this period.

Suggestions of discriminatory practices toward black teacher applicants in the use of the so-called "90-day permit" employed to permit hiring before formal receipt of State certification, were not supported by the record.

Recruiting black teachers exclusively from Michigan was and is a difficult task. Although Michigan State University is the nation's largest producer of teachers, it counted only 50 black graduates in a class of 2,635 in 1971–1972. The same year, Western Michigan University, second largest producer of teachers in the United States, graduated a total of 2,418 teachers, but only 53 were black.

Mr. Schreimer testified that between 1964 and 1967, the Grand Rapids Board hired 98% of the black teachers whom it interviewed. Starting in 1968–69, the equivalency requirements mandated by the Michigan State Board of Education were broadened to encompass additional states so that by 1971 the Michigan

State Board of Education granted full equivalency with all other states. This action substantially improved capabilities for hiring black faculty and the proofs preponderate that Grand Rapids was quick to take advantage of the opportunity. The interview schedules, the testimony, and the results achieved demonstrate an aggressive and successful effort to bring more qualified black teachers into the system. Thus, between 1965 and 1972, the percentage of nonwhite personnel increased from 5.9% to 13.7%. This is particularly impressive in view of the 1970 census figures showing the black population at 11.3% of the total.[10]

Likewise, professional black administrative personnel have been increasing. Of 76 principals in the Grand Rapids School District, 15 are black. Six of 13 assistant principals are black. In actual numbers, black teachers have increased from five in 1950–51 to 50 in 1960–61, to 237 in 1972–73, the latter out of a total of 1,596. Mr. Schreimer testified that in 1972–73, of 140 black applicants interviewed for teaching positions, 40, or 28% were hired, whereas only 10% of white applicants were hired.

### 2. Faculty Assignments [11]

The court finds that for years and through 1970 most black faculty personnel were assigned to predominantly black schools. At the same time there is no proof that any black teacher was ever denied an application to teach in white schools when she or he specifically requested it. In fact, what testimony there is rebuts such a contention.

Mrs. Lewis' assignments have already been referred to. Lola Davis, since 1970 Director of Project Follow Through, requested a transfer in the Spring of 1962 from predominantly black Sheldon School to an outer-city school. Miss Davis, a black, felt she needed the change as part of her professional growth. The following Fall, she was placed in Buchanan School which was all white.

Ethel Mae Riptoe, black, was engaged from time to time as a substitute teacher before taking on a full-time teaching assignment at Sheldon School. When she complained about her assignments solely in black schools, the complaint was promptly acted upon and thereafter she was given work throughout the entire city.

None of the several other black teachers testifying expressed dissatisfaction with teaching assignmnets.

If there was never a formal policy of restricting black teachers to predominantly black schools, it is nevertheless true and the court finds that actual practice largely had this effect until eliminated in 1969 and 1970. In view of the aggressive recruiting policies and other evidence, it is difficult to find any specifically discriminatory intent in the practice. Faced with a low percentage of black teachers and an ever-increasing number of black school children, the practice probably seemed entirely logical at the time. The historic absence of involuntary transfers until 1969, the preference of highly motivated black teachers to help their own race, the concept that the presence of a black teacher in a predominantly black classroom

---

10. Weight to be attached to this comparison, however, must take into account the higher percentage of children included in 11.3%, while recognizing that the black faculty percentage would be presumably lower if non-public school teachers were included.

11. The basic statistical data before the court with respect to faculty assignment appears in its best form in PX 29–D, which shows the assignment of black faculty year by year within the Grand Rapids District, excluding special schools, between 1954 and 1970. PX 29–A shows the assignment of black class-room teachers to Grand Rapids elementary and secondary schools in the same period. It shows much the same, but perhaps in a more graphic form. GR 7 shows the total number of non-white teachers in the Grand Rapids public schools since 1950, together with the number of different assignments which they had and has attached to it additional more particularized data as of September 5, 1972. GR 11 shows the presence of black teachers in the inner-city elementary schools which had more than 40% black enrollment between 1965 and 1972.

provides the student with a realistic and attainable success image—these factors, combined with at least some evidence of hostility in "white" schools, all made the practice seem acceptable and even desirable.

Into this state of facts came Joseph H. McMillan, now Assistant Vice President of Michigan State University. Dr. McMillan, himself black, hired into the Grand Rapids system in 1956 at Sheldon Elementary School. Sheldon was then about 90–95% black and had a faculty of three black and 20 white teachers. Dr. McMillan became assistant principal and, in 1960, principal of Sheldon School, the first black to attain either position in the Grand Rapids system. He left in 1963–64 on a sabbatical to pursue his doctoral studies in education, then returned as principal of Sheldon until June 1966 when he was appointed Superintendent of Inner-City Schools.

The vast majority of black children attending elementary schools found themselves in eleven of these inner-city schools. While he denied responsibility for the increase in black teachers within the inner-city schools, the fact is that the percentage of black teachers in the eleven predominantly black schools, 23% at the time of Dr. McMillan's appointment, grew to 36% in 1969 when he resigned as Director of Inner-City Schools.

Dr. McMillan is a forceful, intelligent man, exceedingly concerned for the well-being of his race, as evidenced by his "Black Paper" delivered to the Superintendent at the time he resigned from the system (GR 9). This attitude, right or wrong, tends to corroborate Mr. Schreimer's testimony that much of the impetus for the increase in percentage of black teachers in the eleven schools came from Dr. McMillan. There is testimony in the record that, at the time of Dr. McMillan's tenure as Inner-City Director, thought in the black community, albeit minority, supported a trend toward semi-autonomous black schools operated by and for blacks.

However the condition came about, it was recognized after 1969 that the concentration of black teachers in predominantly black schools, whatever its merits in some respects, was fundamentally unsound, a position generally supported by both sides during the trial. It was also unconstitutional.

The situation thus created demanded correction and the Board, Mr. Schreimer, and upon his arrival in December, 1970, Superintendent Philip E. Runkel, went to work at it. Recognizing that a purely voluntary system of assignment would not achieve this, the Board for the first time in its history wrote into its teacher contracts commencing January 1, 1969, a specific provision which permitted involuntary reassignment of teachers in order to achieve racial balance.

The concentration of black faculty in predominantly black schools, at its high point in 1969, is rapidly declining and is matched by an impressive spread of black faculty throughout the entire system, to the extent that at the trial only eleven schools in the entire 70-school system were without at least one black teacher. Identifiability still existed, however, at the time of trial and is particularly noticeable at Alexander (8 of 21½), Henry (7 of 20½), Sheldon (9 of 18), and Vandenberg (6 of 13½) elementary schools. It is also apparent at the middle and junior high school level, particularly at South Middle.

If there had merely been an assignment of teachers to teaching posts according to their personal preferences without regard to their race, and if such assignment had, in fact, resulted in somewhat of an imbalance, the court might not be constrained to act. However, from an examination of the evidence, the court is satisfied that the assignment system went beyond that. There was throughout the proofs, an initial assumption and expectation on the part of the Grand Rapids Board officials that black teachers were usually to be assigned to teach black students. Consistently through the proofs discussion of hiring and assigning black teachers was nearly always in terms of assign-

ment to predominantly black schools. Though there was acquiescence generally by the applicants for teaching positions, the fact remains that it was nevertheless discriminatory.

A disproportionate percentage of black faculty, it is agreed, tends to racially identify the school in the perceptions of its own students, of the students in "white" schools, and of the public. Conversely, it is recognized that a racially balanced faculty has great benefit by improving the perception of the white community of the capabilities and achievements of blacks in a pluralistic society. As indicated elsewhere in this opinion, the evidence preponderates that notwithstanding the foregoing, the quality of teaching, black and white, inner-city and elsewhere, was and is uniformly high and no teacher dissatisfaction concerning assignment and transfer practices was noted. This finding is consistent with the findings in the Racial Imbalance Study of June 16, 1966.

 With respect to faculty hiring, the court finds by a preponderance of the evidence that hiring practices in the 1940's were discriminatory against black applicants, although this is based upon very meager evidence. The court finds that in the 1950's, hiring practices gradually changed from one of hostility to one of neutral criteria, the limited availability of black teachers being the principle cause for any relative faculty imbalance in the system.

From 1961 on, the proofs preponderate that the efforts of the Grand Rapids Board were increasingly aggressive in the recruitment of black faculty, even to a point of preference over white applicants. Thus, the recruitment practices during that period and to date have not been discriminatory against black applicants for faculty positions.

Any injury to plaintiffs and their class by the earlier hiring practices is too at-tenuated to have any measurable effect upon the present composition of the faculty or upon its composition at the time suit was instituted.

 The court finds that while there is no evidence of refusal to honor requests of black teachers for assignment in other schools, the clear purpose and effect of assignment practices within the Grand Rapids Board during that period was to place black teacher applicants primarily in schools having a heavier black student attendance. The court finds that this practice was, in fact, discriminatory. The court further finds that the practice was consciously abandoned in 1969 and that since that time and to the time of trial, Board actions have affirmatively been aimed at correcting imbalance which had resulted from the discriminatory practice. The court finds, however, that the condition had not, by the time of the trial, been fully corrected and that the effects of the conduct still persist.

 Did the discriminatory assignment of teachers create or contribute substantially to the creation of a dual system? The court finds that it did not.

There are several reasons for this conclusion. First, the evidence is convincing that the circumstance, coming when it did, was not a contributing factor to the imbalanced residential patterns existing in the city, since there was, during the time those patterns were developing, little if any black faculty within the school system at all. Second, with one exception, the schools involved never had less than a majority of the teachers which were white, and only rarely did the actual percentage of black teachers in a given school exceed the percentage of black school children in the system as a whole.[12] In other words, the problem was usually the absence of black teachers elsewhere in the system rather than their presence in predominantly black schools.

12. The one exception appears to have been Alexander School in 1957 when five of nine teachers were black. Student enrollment that year was 5.6% black. In 1958 there was one black teacher out of a total of eleven, a circumstance which continued until 1965. The reason, if indeed there is any, does not appear.

Third, the faculty imbalance did not result in reduced quality of teaching. Fourth, during the period when assignment practices could be said to have an impact of significant proportions upon the racial identifiability of a given school, because of residential patterns and the percentage of black student attendance, the schools were already racially identifiable. Clearly this is not a laudable circumstance, but in terms of perceptions it had to be true. Last, there were always since 1954 at least some black teachers in predominantly white schools in the system, though their numbers were limited. (PX 29D).

## I. Reimbursement of Transportation Costs

 There was proof that rural school districts received up to 75% reimbursement for student transportation expense where none was, until recently, received by the Grand Rapids Board or other districts for students residing within the city limits. While plaintiffs do not press any claim that the law is unconstitutional, they urge that the fact of the distinction is discriminatory as part of overall state action claimed violative of plaintiffs' rights. It is an urban-rural classification distinction based upon known differences usually characteristic of urban and rural areas: absence of public transportation, sidewalks, lesser density of student population and generally longer distances. It is in no part related to racial difference.

The exercise of legislative discretion in this regard is as valid as is that which sees the Grand Rapids School District receive annually over $1,000,000 in compensatory aid money under Section 3 of the State Aid Act, funds in which the suburban school districts do not participate at all. The overall record heavily supports the claim that no financial discrimination has been practiced against plaintiffs and their class in the operation of the school system at any level. On the contrary, per pupil expenditures on behalf of plaintiffs and their class, and others of less favored social or economic status substantially exceed the average.

## V. LAW

### A. Joinder of Parties

Originally a class action against the Grand Rapids Board alone, the latter sought to join eleven suburban school districts, to be followed by the plaintiffs' amendment of their complaint to add the State defendants, following the resolution of the same issue in Bradley v. Milliken, 433 F.2d 897, 905 (6th Cir. 1970). The question then arose whether the court should permit, at that date, the joinder of those parties, at the expense of delay of the scheduled trial. The State defendants were clearly proper parties under the pleading and under Bradley v. Milliken, supra. Were, also, the suburban school districts?

 It was unquestioned that action of school boards was "state action" within the meaning of the Fourteenth Amendment, Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). And, under the Michigan Constitution, education of its citizens in public schools in unquestionably a state responsibility. See discussion of Michigan law in this regard, pp. 56–62, Bradley v. Milliken, 484 F.2d 215, 6th Cir. decided June 12, 1973. Arguably, the interests of the suburban school districts could be adequately represented by the State Board of Education, the Superintendent of Public Instruction and other State defendants. At the same time, the local districts enjoyed by law a distinct identity, potentially differing interests, and the same capacity to sue and be sued as possessed and exercised with respect to the Grand Rapids Board of Education. M.C.L.A. §§ 340.154, 340.192; M.S.A. §§ 15.3154, 15.3192. Although the precise issue had not been decided, general concepts of due process strongly suggested that if the suburban school districts had potentially adverse interests to be affected, they were entitled to notice to defend and an opportunity to be heard upon those issues which could affect them, if

decided adversely to their interests. Accordingly the court ordered the joinder.

Bradley v. Milliken, 784 F.2d 215 (6th Cir.) 1973, supra, pp. 251–252 has since held that local school districts were at least entitled to be represented and heard at any remedy hearings which could affect them, although it did not require reopening proofs on the issue of segregation in Detroit. While this court's earlier ruling went somewhat further than that, it at least gave to those local districts the right to be heard and left to them the decision as to whether to exercise it. They did. The result undoubtedly somewhat prolonged the trial, but had the advantage of putting the issues into sharper focus and of avoiding a potential constitutional pitfall.

### B. The Segregation Issue: General

The language is so simple that it is often difficult to remember that it took a civil war to make it a part of the fundamental law of the nation. Section 1 of the Fourteenth Amendment to the United States Constitution provides in part that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws".

The issue in this case, therefore, is whether the defendants here have denied to the plaintiffs the equal protection of the laws, and if so, what is to be done about it.

The application of so straightforward a legal statement was never simple; it is immensely complex today because life itself is complex and bears but little resemblance to that which spawned it over one hundred years ago.

It was the United States Supreme Court's interpretation of the Equal Protection Clause at the time of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) that its mandate was satisfied if black citizens were accorded equal, though separate treatment, under the law. *Plessy*, which specifically applied to railway transportation in Louisiana, was thereafter assumed to extend as well to public schools, Cum-ming v. Board of Education, 175 U.S. 528, 20 S.Ct. 197, 44 L.Ed. 262 (1899); Berea College v. Kentucky, 211 U.S. 45, 29 S.Ct. 33, 53 L.Ed. 81 (1908).

Plessy v. Ferguson was construed by most southern states, and many elsewhere, as justifying state laws which maintained separate public school systems for black and white children, the sole requirement under federal constitutional law being that if they did so, the systems must be otherwise equal. This construction of the Equal Protection Clause remained until 1954, when the Supreme Court held, in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (Brown I) that:

" . . . in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment." *Brown I*, supra, p. 495, 74 S.Ct. p. 692.

Although *Brown I* did not speak in terms of "dual" and "unitary" school systems, the concepts were born in that case. A "dual" system was one which assigned students by law and explicitly upon the basis of their race; inferentially, at least, a "unitary" system was one which did not. As later defined "unitary" came to mean a system "within which no person is to be effectively excluded from any school because of race or color". Alexander v. Holmes County Board of Education (1969), 396 U.S. 19 at p. 20, 90 S.Ct. 29 at p. 30, 24 L.Ed.2d 19.

Under *Brown I* and its successor, Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II), the dismantling of dual school systems became a constitutional objective. *Brown II* directed the school authorities to correct the injustices

which they and the states had created. However, where local authorities should fail or unduly delay in compliance, the court foresaw a role for the district courts in achieving this objective:

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power." Brown II, supra, p. 300, 75 S.Ct. p. 756.

It would appear to be a fair statement that in the years that followed, and until this year, the focus of the Supreme Court and of most lower courts was primarily directed toward remedy, for in the southern states the existence of "dual" systems prior to Brown I was virtually a foregone conclusion. To prove a constitutional violation rarely required more than reference to state statutes on the books in 1954 requiring compulsory separation of the races, as a matter of law. Thus the bulk of the law during those years dealt with efforts of the federal trial court, on default of local school authorities, to fashion effective remedies, and in the process to overcome persistent efforts at the local level to get around them. Racial imbalance, not specifically considered in Brown I or Brown II, came under judicial scrutiny as courts sought to ascertain whether court-ordered desegregation plans had been effective to render dual systems unitary.

Some dual systems in the south had existed where there was virtually no residential segregation, as in Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) involving New Kent County, Virginia, and Raney v. Board of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968), involving the Gould School District in Arkansas. Elsewhere, however, residential segregation and resulting racial imbalance in schools were causing problems in efforts to achieve unitary systems. Such was the situation in the Charlotte-Mecklenburg system in North Carolina, and in a review of desegregation remedies there, the Supreme Court took occasion to spell out some of its current concepts, Swann v. Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

Swann was addressed immediately to remedy and to the use of court-imposed bussing of students as a proper exercise of the equitable powers authorized by Brown II. It went further, however, and discussed as well the extent to which court-ordered remedies might be expected to solve the problems inherent in racial imbalance. It spoke in terms of "de facto" segregation and in terms of "de jure" segregation. It expressly left unanswered the extent to which a school desegregation decree may be based solely upon other types of state action not attributable to school authorities:

"We do not reach in this case the question whether a showing that school segregation is a consequence of other types of state action, without any discriminatory action by the school authorities, is a constitutional violation requiring remedial action by a school desegregation decree." Swann, supra, p. 23, 91 S.Ct. p. 1279.

Swann held that where dual systems persisted, plans based on racially neutral criteria were not sufficient if they did not in fact remedy the situation created by the violative conduct.

"The objective is to dismantle the dual school system." Swann, supra p. 28, 91 S.Ct. p. 1282.

At the same time Swann recognized the practical limitations faced by courts and school officials in eliminating private prejudice and racial imbalance generally. It recognized that even in school systems charged with the duty of dismantling dual systems, there may be areas in which minority groups are concentrated:

"The record in this case reveals the familiar phenomenon that in metropolitan areas minority groups are oft-

en found concentrated in one part of the city. In some circumstances certain schools may remain all or largely of one race until new schools can be provided or neighborhood patterns change. Schools all or predominantly of one race in a district of mixed population will require close scrutiny to determine that school assignments are not part of state-enforced segregation.

"In the light of the above, it should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law." Swann, supra, pp. 25–26, 91 S.Ct. pp. 1280–1281.

If there is discernable a distinction between that segregation which is de jure and that which is de facto and not de jure, Swann sought to maintain it in terms of defining permissible court action and relief under the Equal Protection Clause. From Swann:

"In seeking to define even in broad and general terms how far this remedial power extends it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation." p. 16, 91 S.Ct. p. 1276.

Elimination by school authorities of de facto segregation is clearly condoned and encouraged by Swann:

"School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court." (Emphasis

supplied), Swann, p. 16, 91 S.Ct. p. 1276.

Swann, being a unanimous decision of the Supreme Court, at least bore the imprimatur of solid constitutional law. It also recognized that in converting from dual to unitary systems, the Equal Protection Clause would have to be applied to an ever-changing society.

". . . This process has been rendered more difficult by changes since 1954 in the structure and patterns of communities, the growth of student population, movement of families, and other changes, some of which had marked impact on school planning, sometimes neutralizing or negating remedial action before it was fully implemented. Rural areas accustomed for half a century to the consolidated school systems implemented by bus transportation could make adjustments more readily than metropolitan areas with dense and shifting population, numerous schools, congested and complex traffic patterns." Swann, p. 14, 91 S.Ct. p. 1275.

Nevertheless, Swann and earlier Supreme Court decisions provided but little guidance in that growing number of desegregation suits which were being commenced in the north, and in which the term "dual system" could not be applied in the traditional sense. An excellent analysis of the state of the law following Swann is found in School Desegregation After Swann: A Theory of Government Responsibility, 39 U. of Chi. Law Review 421 (1972), which catalogues the confusion in the law which prevailed at the time this case came on for trial.

Applied to the State of Michigan, the term "dual system" had little meaning in terms of the traditional state-enforced separation which was the target of Brown I. The truth was that Michigan, as a state, had never acknowledged the "separate but equal" rule of Plessy v. Ferguson. Session Laws of Michigan of 1867, Vol. I, p. 42 specifically provided that

"All residents of any district shall have an equal right to attend any school therein, provided that this shall not prevent the grading of schools according to the intellectual progress of the pupils, to be taught in separate places when expedient."

Similar statutes have been on the books in Michigan ever since, and are currently embodied in Section 355 of the School Code of 1955, M.C.L.A. § 340.355; M.S. A. § 15.3355.

In the People ex rel. Workman v. Board of Education of Detroit, 18 Mich. 400 (1869), the Michigan Supreme Court held that the 1867 Act was plainly intended to bar from Michigan schools the separate but equal school policy which had theretofore been the practice within the City of Detroit. Thus, in Michigan the law was that no school district could maintain separate facilities for black children living within its boundaries, a ruling which came 85 years before *Brown I* struck down that same practice as violative of federal constitutional rights.

Since this case was tried, the Supreme Court has for the first time endeavored to apply the law of *Brown I* and *II* and *Swann* to a major metropolitan area in which state-enforced separation of school children in the *Brown I* sense had little historical relevance, Keyes v. School District No. 1, Denver, Colo., 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548, decided June 21, 1973. Because, like Michigan, Colorado had by its state constitution and by case law rejected Plessy v. Ferguson well before *Brown I*, and because it was the first case to face the hard facts of residential imbalance so typical of northern cities, *Keyes* was especially important to the resolution of this case.

## C. The Segregation Issue: Grand Rapids

The immediate issues before the court in *Keyes*, supra, have only slight bearing upon the case at bar. In requiring the lower courts in Colorado to consider Negroes and Hispanos in the same category for the purposes of defining segregation within the core city, the Supreme Court took note of the triethnic nature of schools in the Southwest and of the economic and cultural deprivation and discrimination common to the two groups. While plaintiffs' class in this case is limited to negro children and their parents, considerable attention was devoted on trial to the makeup of the district in all respects, including those of Spanish-American ancestry and also those white children within the inner-city who, for one reason or another, were culturally or economically disadvantaged. Of course, here, the number of non-whites other than negroes, has been statistically negligible until the last few years, according to the proofs.

The second issue in *Keyes*, whether any segregation found to exist within the district would be so isolated geographically as to warrant isolated relief was not raised here, nor advanced by either side, unless by the suburban districts in their arguments. At least as to the Grand Rapids School District the issue always was whether it was operating a dual or bi-racial school system, the court here understanding that if it did, the remedy must at least be broad enough to eliminate the violation and its effects.

*Keyes*, however, does contain broader language which must be considered in the context of this case:

"This is not a case, however, where a statutory dual system has ever existed. Nevertheless, where plaintiffs prove that the school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system, it is only common sense to conclude that there exists a predicate for a finding of the existence of a dual school system". *Keyes*, supra, 413 U.S. 189, 93 S.Ct. p. 2694.

In applying *Keyes* to the facts found in Grand Rapids, it becomes necessary, therefore, to determine whether the Board's conduct has amounted to a "systematic program of segregation" as

above set forth. It also becomes necessary, as shown later, to determine whether in measuring that conduct the evidence has been weighed in the light of the burden which *Keyes* appears to establish once a violation is shown.

### 1. *Faculty Discrimination and Keyes*

The court has in its findings of fact determined that the practices of the Grand Rapids Board of Education in assigning black teachers has violated the rights of plaintiffs under the Equal Protection Clause.

 The Constitution does not promise to plaintiffs that they will be taught by white teachers or by black teachers. It does not guarantee a child against all racial imbalance either in enrollment or in faculty in the particular school which he attends. The law, however, does entitle the plaintiffs' children to be taught in schools in which the color or race of the teacher is not the basis for his assignment. This right, in the opinion of the court, has been violated.

The question then presented is whether this finding, once established, creates a presumption which it is the burden of the Grand Rapids Board to overcome. *Keyes* incorporates into desegregation law a rule common in evidence with respect to intent, citing II Wigmore, Evidence 200 (3d Ed. 1940):

"Evidence that similar and related offenses were committed . . . tend(s) to show a consistent pattern of conduct highly relevant to the issue of intent." Cited in *Keyes*, 413 U.S. 189, 93 S.Ct. p. 2697.

*Keyes* then amplifies, 413 U.S. 189, 93 S.Ct. at pp. 2697–2698.

Applying these principles in the special context of school desegregation cases, we hold that a finding of intionally segregative school board actions in a meaningful portion of a school system, as in this case, creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions. This is true even if it is determined that different areas of the school district should be viewed independently of each other because, even in that situation there is high probability that where school authorities have effectuated an intentionally segregative policy in a meaningful portion of the school system, similar impermissible considerations have motivated their actions in other areas of the system. We emphasize that the differentiating factor between *de jure* segregation and so-called *de facto* segregation to which we referred in *Swann* [10] is *purpose* or *intent* to segregate. Where school authorities have been found to have practiced purposeful segregation in part of a school system, they may be expected to oppose system-wide desegregation, as did the respondents in this case, on the ground that their purposefully segregative actions were isolated and individual events, thus leaving plaintiffs with the burden of proving otherwise. But at that point where an intentionally segregative policy is practiced in a meaningful or significant segment of a school system, as in this case, the school authorities cannot be heard to argue that plaintiffs have proved only "isolated and individual" unlawfully segregative actions. In that circumstance, it is both fair and reasonable to require that the school authorities bear the burden of showing that their actions as to other segregated schools within the system were not also motivated by segregative intent.

This burden-shifting principle is not new or novel. There are no hard and fast standards governing the allocation of the burden of proof in every situation. The issue, rather, "is merely a question of policy and fairness based

on experience in the different situations." (Emphasis added)

 As the court here understands the foregoing passage from *Keyes*, the finding of a constitutional violation such as is found in faculty assignment here raises a rebuttable presumption that other segregated schooling within the system is not adventitious. That presumption in turn places upon the school authorities the burden of showing that other actions complained of within the system were not also motivated by a similar intent and, finally, that over all the actions as so viewed did not create a dual system.

 Although the court has difficulty under the facts here in finding that the faculty assignments were purposeful in terms of an intent to segregate either the schools or the children in them, still to the extent that such conduct creates a presumption under *Keyes*, the court finds it to have been rebutted by the other evidence in the case as reflected in its findings.

### 2. The Master Plan and Integration Efforts

The final issue which has demanded the most careful scrutiny and consideration of the court is that which arises from the adoption of the Master Plan and the efforts of the Grand Rapids Board to achieve greater racial balance through the system, by what plaintiffs charge are impermissible methods.

At least some recapitulation of the facts is necessary. It will be remembered that the court has found it to be generally true that present transportation of black children to predominantly white schools is more extensive than required by limits on the actual or effective usable capacity of elementary schools in the inner-city, although plaintiffs' claim of under-utilization is exaggerated. At the same time, it will be remembered that what bussing there is, is not confined to black children alone, but affects white children in the inner-city schools as well. Because the black children now constitute the majority of inner-city enrollment, however, the impact is greater upon them and appears to be recognized to be so by the Board. The claim of lack of reciprocity made by plaintiffs is modified somewhat, but not refuted by evidence that a certain number of white children of pre-school age are brought in to integrated inner-city classes in predominantly black neighborhoods and by efforts to retain racial balance at Iroquois Middle School.

The proposed construction of Pre-K-3 centers in the inner-city and other provisions in the later phases of the Master Plan to provide integrated school experience after the third grade, but outside predominantly black residential neighborhoods, elicit from plaintiffs the same complaint.

The charges made by plaintiffs in this regard are serious, but they must also be weighed in the light of the court's finding that the action complained of is motivated by a desire to achieve greater racial balance without inducing self-defeating exodus of whites from the district, an apprehension which the court has found to be reasonable and warranted on the basis of the facts found in the case.

It is perhaps typical of the plaintiffs' complaints and of the dilemma faced by the Grand Rapids Board that in plaintiffs' proposed finding of fact No. 49 they object to the Master Plan and in proposed finding of fact No. 50 they find that the failure to follow it through is a rescission and hence violative of Fourteenth Amendment rights.

There is, in fact, authority to support both contentions of the plaintiffs, inconsistent as they may be.

Applied together as plaintiffs urge, these propositions would completely paralyze the ability of the Grand Rapids Board to deal effectively with racial imbalance in any meaningful way, regardless of whether it was ever guilty of any purpose or intent to segregate. Such, in the opinion of the court was never the objective of *Brown II, Swann* or *Keyes*.

■■■ *Swann,* cited supra, readily acknowledges the right of school authorities, under their broad powers, to achieve better racial balance and to eliminate *de facto* segregation even absent a constitutionally imposed obligation to do so. It is an important and valuable responsibility, the exercise of which should not be so casually frustrated. Where state-imposed segregation has been ordered corrected, the touchstone uniformly has been individuality, flexibility and practical effectiveness. It would appear to the court here that where a school district in good faith and under no legal compulsion seeks to correct racial imbalance within its boundaries, it ought at the minimum to be accorded even wider discretion, especially where in the past it has shown itself capable of exercising it wisely and without discrimination.

*Brown I,* subsequent case law and prevailing thought evident in the proofs in this case all confirm the conclusion that one-race schools are educationally undesirable. The Supreme Court twenty years ago in *Brown I* found to be supported by then modern authority the lower court's finding:

> "Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system." [10] *Brown I,* 347 U.S. p. 494, 74 S.Ct. p. 691.

State-enforced segregation, therefore, was clearly found not only unconstitutional but detrimental to the educational and mental development of negro children. When the stigma attaching to state action is removed, the question becomes whether the harm still persists from the mere fact that a given school is all of one race, apart from the cause of it.

■■■ While the extensive expert testimony at the trial of this case is not unanimous, and while precise proof from controlled testing and sampling may not be practically possible, still uniformly it is acknowledged that elimination of racial imbalance, or *de facto* segregation, is desirable in and of itself, regardless of cause, and that it is educationally important to children of all races in preparing them to exist harmoniously in a pluralistic, melting-pot society. It was to this that the Joint Policy Statement adopted by the Michigan Board of Education and the Michigan Civil Rights Commission was directed. It was *de facto* segregation which the Racial Imbalance Committee found worthy of attention and elimination, even though its opinion was that *de jure* segregation did not exist in Grand Rapids. It was *de facto* segregation which the Master Plan sought to alleviate as it proceeded to reorganize the Grand Rapids School system.

The "broad power to formulate and implement educational policy" possessed by school authorities, as set forth in Swann has been mentioned earlier.

■■■ It is well settled law that concern for white flight will not justify the failure to proceed with court-ordered desegregation aimed toward the elimination of a dual system. In Monroe v. Board of Commissioners, 391 U.S. 450, 459, 88 S.Ct. 1700, 20 L.Ed.2d 733, the Supreme Court dismissed such arguments advanced to oppose elimination of a "free transfer" plan which had proved ineffective to dismantle the dual system existing in Jackson, Tennessee. The same argument was advanced by defendants and rejected by the Supreme Court in United States v. Scotland Neck Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972). There Halifax County, N. C. was in the process of dis-

mantling its dual school system when a state statute was enacted to create, out of the whole, a new and separate school district for Scotland Neck, a city within the county affected. It was held there that the action was designed to defeat desegregation by deliberately creating a refuge for white students, an action which could not be justified by concern that otherwise the white students would flee the system. The difference between those cases and this has to be apparent. There, concern over white flight was used to avoid integration; here, it was considered in connection with voluntary efforts realistically to achieve it.

In Bradley v. Milliken, 484 F.2d 215 (6th Cir.) 1973, the Sixth Circuit expressly affirmed the trial judge's holding that a Detroit-only plan of desegregation:

"will lead directly to a single segregated Detroit school district overwhelmingly black in all of its schools, surrounded by a ring of suburbs and suburban school districts overwhelmingly white in composition in a State in which the racial composition is 87 per cent white and 13 per cent black." *Bradley,* supra, 484 F.2d p. 249.

If a trial judge, with the blessing of an appellate court, is permitted to recognize the inefficacy of a plan which will be self-destructive by inducing white withdrawal to the suburbs, the same realistic attitude can hardly be criticized in a school board. *Swann* recognizes that in efforts to eliminate dual school systems:

"The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations, and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems". *Swann,* supra, 402 U.S. p. 28, 91 S.Ct. p. 1282.

Michigan courts recognize the power and authority of school officials under the equal protection clauses of both the state and federal constitutions expressly to consider racial balance as a criteria in setting attendance areas, Mason v. Flint Board of Education, 6 Mich.App. 364, 149 N.W.2d 239 (1967).

The growing futility of traditional desegregation measures to achieve and maintain racial balance, and the strong evidence that the efforts themselves merely resulted in even greater racial imbalance is catalogued in Calhoun v. Cook, 332 F.Supp. 804 (D.C.Ga.1971) involving Atlanta, Georgia. From the thoughtful opinion in *Calhoun:*

The white students remaining are concentrated at the extreme northern and southern ends of the district, while the vast middle is a broad belt of industry and high-density solid black housing. The line between these areas is steadily creeping towards the ends, with increased black housing and diminished white housing. Since 1961, it has annually achieved substantial temporary integration by the establishment or construction of "line schools". However, 34 of those schools have gone from all-white to 90% or more black during the period. This "tipping process" is so rapid that it sometimes occurs by the time a facility deliberately located to increase integration can be completed and occupied. Seldom does it last longer than two years. Since official desegregation in 1961, 24 new schools have been constructed, several of which have been especially built to serve federal housing developments in the inner city. Others were appropriated for such purposes. In spite of official laws and directives to the contrary, the bulk of such developments have been operated as all-black since inception. As a natural consequence, 29 schools provided for such "controlled situations" are substantially black. Enforcement of fair housing legislation under Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), and Title VIII of the Civil Rights Act of 1968 will automatically integrate these zones. See Hightower v. West, 430 F.2d 552 at 556 (5th Cir. 1970).

The cause of such frustrating results lies in factors completely beyond the control of school authorities. Segregated housing, whether impelled by school changes or not, remains the unconquerable foe of the racial ideal of integrated public schools in the cities. The white flight to the suburbs and private schools continues. As far back as 1967, in an offshoot of this case involving the proposed construction of an all-black school in the heart of the black belt, the problem was accurately characterized by plaintiffs' witnesses and the court as *de facto* rather than *de jure*. Griggs v. Cook, D.C., [Ga.] 272 F.Supp. 163, aff'd 384 F.2d 705 (5th Cir. 1967). The problem is no longer how to achieve integration, but how to prevent resegregation. Only last year, the parties and Judge Hooper for this court exhaustingly investigated possible remedies for over seven weeks of trial, culminating in the orders involved in this appeal and remand. Some of the fruits of those "best efforts" have already slightly soured in the face of evolutional *de facto* changes. Through it all, the Atlanta system has maintained a traditional position of leadership in the public schools. It remains at the top of the state in pay scale, curriculum development, and innovative efforts in quality education.

The factual circumstances in Indianapolis, Indiana and the trial judge's recognition of the inadequacy of traditional remedies in a modern metropolitan setting are set forth in United States v. Board of School Commissioners, 332 F.Supp. 655 (1971), aff'd, 7th Cir. 474 F.2d 81 (1973). While on the facts there, constitutional violations were found, District Judge Dillin, in considering what should be done to cure the *de jure* segregation then still existing, concluded upon the evidence before him:

"Put another way, the easy way out for this Court and for the Board would be to order a massive 'fruit basket' scrambling of students within the School City during the coming school year, to achieve exact racial balancing, and then to go on to other things. The power to do so is undoubted. There is just one thing wrong with this simplistic solution: in the long haul it won't work." United States v. Board, supra, p. 673.

Judge Dillin, in considering the problem of immediate relief recognized the potential need for some one-way bussing in order to maintain some stability in those schools which were approaching the "tipping" point:

"It is recognized that the order thus far made will not result in significant desegregation of majority-black schools immediately, unless the voluntary transfer and outside school corporation transfer policies are unusually successful. It is also recognized that mandatory transfers to maintain stability . . . may largely involve Negro students, as is certain with regard to transfers to the outside school corporations. Neither of these facts seems 'fair' in a theoretical sense, and have caused the Court a great deal of concern. However, there is a limit to what can be accomplished at one time . . . ". United States v. Board, supra, p. 681.

The court is unable to agree with plaintiffs' claim that failure by the Grand Rapids Board to follow through with the later phases of the Master Plan in some way amounts to "backtracking" or "rescission" which itself would be violative of their rights.

By its own terms, the plan was never intended to be inflexible or unchangeable. Changing patterns within the city and a general levelling off of enrollments, especially at the elementary level must be factors affecting implementation. The uncertainties of this lawsuit, and plaintiffs expressed objection to part of the plan had to act in part as deterrents to its continued implementation. It would have been patently absurd to expect the Grand Rapids

Board to embark on the proposed expensive construction plans when faced with the possibility they might be found inconsistent with court-ordered plans. While the Master Plan apparently has some built-in adaptability to further consolidation or cooperation with outlying school districts, the expansion of this lawsuit to metropolitan proportions could only produce further uncertainties.

To meet their responsibilities, school boards in cities having substantial *de facto* residential segregation must have more discretion than a mere option between maintaining the status quo and the "fruit basket scrambling" to which Judge Dillin referred.

The efforts of the Grand Rapids Board of Education in recent years to achieve better racial balance in the school system may be "awkward, inconvenient and bizarre". It is certain at least that they have been imaginative and that, compared with the doleful record of other American cities which have tried more with less results, they are providing an increasingly wide and integrated experience for children who badly need it.

What the Grand Rapids school system may do on its own following the conclusion of this lawsuit is impossible to know. Undoubtedly it learned much from this litigation. If there are other and better ways to pursue its goal of effective racial balance, it has the flexibility to seek them out and try them.

Obviously much remains to be done, as amply demonstrated by the facts found in this opinion. Still there is a factual basis for guarded optimism, at least. The financial base is sound. There remains a viable racial mix in the student and overall population. Enrollments are levelling off. Heavy concentrations of children in the inner-city may ease off as the black neighborhoods achieve a more normal age spread. The drop in residential segregation, evident though slight in the 1970 census, may continue as housing opportunities, incomes and educational levels increase. Fear, that ancient enemy of meaningful integration of the races, should continue to subside in a generation that has learned much since 1954.

Whatever may come in the Grand Rapids School District will be too much for some and not enough for others. It is impossible to conceive that there never were and are not now individuals within the system and without who are not motivated by racial bias. At the same time, the evidence suggests that they were never able to achieve and maintain the upper hand. The difference may be geographic, or cultural, or economic or completely fortuitous, but it exists to distinguish the Grand Rapids system from others which have been the source of judicial scrutiny in desegregation cases. On the whole, there is too much evidence of good faith effort and too much potential for ultimate benefit to plaintiffs' class to warrant the court's finding that the efforts of the Grand Rapids Board to achieve racial balance have been constitutionally violative of plaintiffs' rights.

## VI. CONCLUSIONS

Accordingly the court finds:

1. That it has jurisdiction over the subject matter and the parties in this action, under 28 U.S.C. § 1343(3), the suit being authorized by 42 U.S.C. § 1983 to redress grievances caused by alleged violations of the Fourteenth Amendment.

2. That the defendant Grand Rapids Board of Education has at all times referred to in plaintiffs' complaint and at the time of trial operated a unitary public school system.

3. That the Grand Rapids Board of Education in its assignment practices with respect to black school teachers and black administrative personnel at the school level, excluding special schools, has violated the rights of plaintiffs and the class they represent as guaranteed under the Equal Protection Clause of the Fourteenth Amendment, by a con-

sciously disproportionate assignment of such teachers and administrative personnel to predominantly black schools.

That the impermissible assignment practices referred to continued to the time of the trial of this case, but while violative of plaintiffs' rights, have not alone, or with other practices complained of, created a segregated or dual system within the Grand Rapids School District or any part thereof, any presumption arising therefrom having been met and overcome by competent and convincing proof to the contrary.

5. That the proofs have failed to establish the other allegations in plaintiffs' complaint, as amended, as to the Grand Rapids Board of Education or as to any other defendants in the case.

### ORDER

In accordance with the foregoing findings and conclusions,

It is ordered as follows:

1. That plaintiffs' complaint, as amended be and hereby is dismissed on the merits with prejudice as to all defendants except the Grand Rapids Board of Education, the members and superintendent thereof.

2. That the Grand Rapids Board of Education and individual members thereof, its superintendent, officers, agents and employees, and those acting in concert with them be and they are permanently enjoined from assigning teaching and administrative personnel at the school level within the Grand Rapids School District so as to make racially identifiable any school within the system by reason of its teaching or administrative staff.

3. That said defendants immediately take steps to eliminate any racial identifiability of said teaching and administrative personnel, on their own initiative and that, not later than July 27, 1973, they file with the court, and submit to counsel for plaintiffs and counsel for intervenors a plan for assignment and reasignment of teaching and administrative personnel which will expeditiously, effectively and fully eliminate the racial identifiability of staff at the school level, and any vestiges thereof.

4. That the Motion to Intervene, heretofore filed December 13, 1972 on behalf of the Michigan Education Association and Grand Rapids Education Association, be and the same is hereby granted and that said intervenors be served with a copy of this Opinion and Order.

5. That the court retain jurisdiction of the parties and the subject matter of this lawsuit, except as to those parties dismissed, until the further order of the court.

6. That on August 10, 1973 at 10:00 a. m. a hearing will be held in Grand Rapids to consider the plan submitted, the feasibility thereof or any objections thereto, and any alternate plans which may be filed by plaintiffs and intervenors.

7. That the court being of the opinion that its order and opinion issued concurrent therewith involve controlling questions of law as to which there is a substantial ground for difference of opinion, and being of the opinion that an immediate appeal from the order herein entered may materially advance the ultimate termination of the litigation, a certificate granting right to appeal will, on application, be granted under 28 U.S.C. § 1292(b).

### APPENDIX B †

### A PROPOSED CONSTRUCTION PROGRAM FOR GRAND RAPIDS

The goal of the school organization for Grand Rapids will be to effect a quality education for all students. To effect this, a compensatory education program for preschool and early elementary children should be effected in the inner city,

† [Appendix A is omitted from published opinion and appears only as appended to original opinion.]

and an integrated educational program for all students in the Later Elementary Middle School and High School.

To effect such a program, the construction of needed school facilities and the replacement of obsolete structures will be located outside of the inner city. This would include facilities for the 3–5 later elementary level, the 6–8 middle school level, and the high school. Such a program, however, would anticipate the continuing use of facilities that are functionally sound. It should be understood that changes on the horizon for education of youngsters in the inner city, will shrink present facilities. The Middle Cities program, which is effected by the State Legislature, is a prime example of this situation. This program calls for reduction in adult teacher-pupil ratio to 20:1, which automatically reduces the capacity of the facility. Headstart and Follow Through programs are further examples of reducing facility capacity, and the Board of Education's policy relative to lower teacher-pupil ratio in inner cities, is an example of local effected reduction and building capacity.

This program would mean that elementary buildings such as Alexander, Coit, Jefferson, Sigsbee, and Straight would be replaced on their present sites with Early Elementary units only; youngsters in later elementary grades from these areas would be dispersed to larger, periphery-located elementary centers. No middle schools would be constructed in the inner city. At the high school level we propose an adaptation of the great high school plan, together with the Educational Park. Again, this would mean that the high schools would be located at the periphery of the school district with the Educational Park in the center, associated with the Junior College development.

*In this plan, it would not be proposed that cross busing be effected, but rather that busing would be one way from the inner city to the periphery educational centers.*

A proposed time schedule for this plan follows; however, it should be indicated at the outset that the accomplishment of this schedule will be dependent on cost factors in construction and the financing capacity of the Board of Education.

## IMMEDIATE PLAN—EFFEC-TIVE SEPTEMBER 1968

A. Begin programming for half-day preschool program for all four-year-olds in the inner city target area.

B. Implementation of a no-retention policy through the 8th grade.

C. Implementation of a non-graded program through the 8th grade.

D. The closing of South High School, senior high school level, grades 10–12. A detailed description of the boundary changes necessary is made a part of this report. In general, these students will attend Central, Creston, and Union High Schools. This will be accomplished by making Union High School a 10–12 high school, Central a 9–12 high school and effecting a boundary change at Creston, a 10–12 high school. Ottawa High School will become a 9–12 high school.

E. The full utilization of elementary classroom capacity to eliminate overcrowding and to effect the pupil-teacher ratio guidelines of the Board. The details of the boundary changes and transportation plan are attached hereto.

## LONG RANGE PLAN

*Phase I*—Completion 1970–72

1. The conversion of Ridgeview Junior High school to a high school

2. Conversion of Ottawa High School to a middle school, grades 5–8

3. Completion of Ridgemoor Middle School, grades 6–8

4. Completion of Chamberlain Elementary School, grades K–5

5. Conversion of Alger Elementary School to a combination elementary school and middle school, grades 7–8

6. Completion of Alexander and Sigsbee Pre–K–2 units. 3rd and 4th graders

from these schools will be transported to elementary schools outside the inner city.

7. Completion of Woodcliff K–2 unit and the Ridgemoor 3–5 Later Elementary Center

8. Continuing implementation of the Educational Park project

9. Use total elementary capacity of the system through the transportation of inner city students

*Phase II*—Completion 1972–74

1. Completion of addition to Union High School, grades 9–12

2. Conversion of Northeast to a high school, grades 9–12

3. Conversion of Creston High School to a middle school, grades 6–8

4. Complete full Pre–K–2 unit at Jefferson School; raze old building

5. Complete Pre–K–2 units to serve the Coit and Straight school areas

6. Effect a new location for Eastern-Orthopedic School

7. Conversion of Eastern-Orthopedic and Sibley to later elementary, 3–5, educational centers

8. Completion of this part of the program will effect a 9–12 educational program at all high schools, and will permit a system-wide balanced enrollment at the secondary level

*Phase III*—Completion 1974–76

1. Complete the following Middle School construction:
 a. Oakleigh (West)
 b. Ken-O-Sha (Southeast)
 c. Perkins (Northeast)
 d. Ridgemoor Addition (Southeast)
 e. Riverside Addition (North)

2. The completion of this phase of construction will permit abandonment of South as a middle school and Union Junior High as a middle school. All middle school age children from the central part of the city

will be dispersed to middle schools on the periphery of the city and a balanced enrollment can be effected at the middle school level.